**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 25-14065

————————————————

FIDENCIO HERNANDEZ ALVAREZ,

*Petitioner-Appellee,*

*versus*

WARDEN, FEDERAL DETENTION CENTER MIAMI,
MIAMI FIELD OFFICE DIRECTOR, IMMIGRATION AND
CUSTOM'S ENFORCEMENT'S ENFORCEMENT AND
REMOVAL OPERATIONS,
ACTING DIRECTOR OF IMMIGRATION AND CUSTOMS
ENFORCEMENT,
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY,
ATTORNEY GENERAL OF THE UNITED STATES, et al.,

*Respondents-Appellants.*

2                    Opinion of the Court                    25-14065

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:25-cv-24806-KMW
_____

_____

No. 25-14075
_____

ISMAEL CERRO PEREZ,

*Petitioner-Appellee,*

*versus*

ASSISTANT FIELD OFFICE DIRECTOR, KROME NORTH
SERVICE
PROCESSING CENTER,
MIAMI FIELD OFFICE DIRECTOR, IMMIGRATION AND
CUSTOM'S
ENFORCEMENT'S ENFORCEMENT AND REMOVAL
OPERATIONS,
ACTING DIRECTOR OF IMMIGRATION AND CUSTOMS
ENFORCEMENT,
SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY,
U.S. ATTORNEY GENERAL, et al.,

*Respondents-Appellants.*

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:25-cv-24820-KMW

———————————————

Before ROSENBAUM, LAGOA, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

The question we face today is whether unadmitted aliens found in the interior of the United States are eligible for bond while they go through immigration proceedings. For nearly thirty years, the answer to that question was, for most aliens, "yes." Last year, the Department of Homeland Security ("DHS") took a different view. It now maintains that these aliens must be detained without bond under 8 U.S.C. § 1225(b)(2)(A).

We are called on to decide if the Government's new reading of § 1225(b)(2)(A) is correct. Hundreds of district courts and four other circuits have already weighed in, reaching well-reasoned yet distinctly contrary conclusions. *See Cunha v. Freden*, No. 25-3141, 2026 WL 1146044 (2d Cir. Apr. 28, 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026); *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048 (7th Cir. 2025); *see also Castañon-Nava v. U.S. Dep't of Homeland Sec.*, No. 25-3050, 2026 WL 1223250 (7th Cir. May 5, 2026). This is the first time our Court has addressed the question.

In these consolidated appeals, Petitioners -- Fidencio Hernandez Alvarez and Ismael Cerro Perez -- were detained without the possibility of a bond hearing pursuant to § 1225(b)(2)(A). Each

challenged his detention under the Immigration and Nationality Act ("INA"), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009 (codified as amended in scattered sections of 8, 18, and 28 U.S.C.). On review of Petitioners' habeas claims, the district court held that the discretionary detention provisions found in § 1226 governed their detention instead, rendering each of them eligible for bond. The Government appeals that decision. It insists that under § 1225(b)(2)(A), Petitioners -- as aliens present in the United States without having been lawfully admitted -- are "applicants for admission," and so they must be detained without the possibility of bond unless they can establish clearly and beyond a doubt that they are entitled to be admitted.

We are unpersuaded by the Government's re-interpretation of § 1225(b)(2)(A). That provision limits no-bond detention to applicants for admission who are "seeking admission," and on the facts of this case, neither Petitioner was seeking lawful entry into the United States after inspection by an immigration officer when he was arrested, nor was either Petitioner taking any cognizable step to obtain the rights and privileges of lawful entry. In fact, neither Petitioner was pursuing any object, let alone "lawful entry," when he was detained following a traffic stop.

The text and statutory structure of the INA, bolstered by the long history of detention across our immigration laws and the congressional purpose in passing IIRIRA, yield the conclusion that no-bond detention generally applies to arriving aliens seeking lawful

entry to the country, and not to aliens who are simply present here. Finally, we reject the Government's claim that even if it has misread the INA, Petitioners are now "seeking admission" because they did not voluntarily self-deport after the initiation of removal proceedings.

We do not hold that Congress is without the power to authorize the detention of unadmitted aliens who are simply present in the country. That question is not before us. We hold only that Congress has not done so under the provisions found in the INA. Nor do we decide whether either Petitioner is a flight risk or would pose a danger to the community if he were released on bond. That, too, is not before us.

We affirm the grant of habeas relief in each of these consolidated cases.

## I.

### A.

The INA supplies three general pathways to detain an alien. First, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."[1] 8 U.S.C. § 1226(a). For those aliens, DHS "may continue to detain the arrested alien," or

---

[1] Following the relocation of immigration-enforcement functions to DHS in 2002 and 2003, this authority was transferred from the Attorney General to the DHS Secretary. *See* 6 U.S.C. § 557; 8 U.S.C. § 1103(a)(1).

"may release the alien" on either bond or "conditional parole." *Id.*
§ 1226(a)(1)–(2).  However, not all detained aliens are eligible for
release.  Thus, under § 1226(c), certain classes of "inadmissible" or
"deportable" aliens with criminal records or who are suspected of
terrorism-related activity must remain in DHS custody.   *Id.*
§ 1226(c)(1)(A)–(E); *see also id.* § 1226(a) (instructing that release
may occur "[e]xcept as provided in subsection (c)").  Federal regu-
lations additionally explain that bond-eligible aliens detained pur-
suant to § 1226 are generally entitled to a review of their custody
determination (including whether they may be released on bond)
at a hearing before an immigration judge.   *See* 8 C.F.R.
§§ 1003.19(a), 1236.1(d)(1).

Second, § 1225 provides for the detention of certain other
aliens without need of a warrant.  That section applies to "appli-
cants for admission," which the INA defines this way:

> An alien present in the United States who has not
> been admitted or who arrives in the United States
> (whether or not at a designated port of arrival and in-
> cluding an alien who is brought to the United States
> after having been interdicted in international or
> United States waters) shall be deemed for purposes of
> this chapter an applicant for admission.

8 U.S.C. § 1225(a)(1).  Section 1225 requires the detention of certain
classes of applicants for admission, depending on the applicant's
status.  For instance, an alien "who is arriving in the United States"
without appropriate entry documents, or who is in possession of
fraudulent entry documents, is to be "removed from the United

States without further hearing or review" unless the alien raises a claim for asylum or a credible fear of persecution, and is detained pending expedited removal. *Id.* §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), (a)(7); 8 C.F.R. § 235.3(b)(2)(iii).

For applicants to whom expedited removal does not apply, § 1225(b)(2)(A) further provides that some applicants for admission may be detained for a fuller review of their admissibility. That provision reads this way:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). Applicants for admission detained pursuant to § 1225(b)(1) or § 1225(b)(2) may be released from DHS custody on a grant of "humanitarian parole," which allows an applicant to be released for "urgent humanitarian reasons" or "significant public benefit," provided he "present[s] neither a security risk nor a risk of absconding." *Id.* § 1182(d)(5)(A); 8 C.F.R. § 212.5(b).

Finally, but of no moment in this case, an alien may be detained and held upon the issuance of a final order of removal, pending the execution of the order and the return of the alien to his country of origin or a different country as provided by the statute. 8 U.S.C. § 1231(a)(2)(A)–(b)(1)(B).

8                     Opinion of the Court                    25-14065

*B.*

Petitioners Hernandez Alvarez and Cerro Perez are Mexican nationals who entered the United States without inspection, but have resided in the United States since 2019 and 2015, respectively. Hernandez Alvarez has no criminal history, and is the father of two children who are U.S. citizens.  Cerro Perez has three children who are American citizens as well.  Before this encounter with law enforcement, he has been cited only for minor traffic violations since entering the United States.

Petitioners were arrested by immigration authorities following two traffic stops; Hernandez Alvarez was arrested on September 16, 2025, and Cerro Perez was arrested a day later.  Petitioners were placed in removal proceedings, and were charged with, among other things, being inadmissible as aliens who entered the United States without inspection under 8 U.S.C. § 1182(a)(6)(A)(i).

Following their arrest, Petitioners were transferred to the Florida Soft-Sided Facility-South ("Alligator Alcatraz").  Each was then transferred again; Hernandez Alvarez to the Miami Federal Detention Center, and Cerro Perez to the Krome North Service Processing Center.  DHS issued custody determinations for each of the Petitioners, continuing their detention without the possibility of bond.  Because of these determinations, and in light of recent precedent from the Board of Immigration Appeals ("BIA"), no immigration judge had the authority to consider either Petitioner's bond request. *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 227–28 (BIA 2025).

25-14065                Opinion of the Court                9

Thereafter, Hernandez Alvarez and Cerro Perez sought relief in federal court, each filing a petition for habeas corpus under 28 U.S.C. § 2241 in the Southern District of Florida. They claimed their continued detention without bond violated federal law, and asserted three grounds for relief: (1) violation of the INA, because the mandatory detention provision of § 1225(b)(2)(A) did not apply; (2) violation of applicable bond regulations, 8 C.F.R. §§ 236.1, 1003.19, 1236.1; and (3) violation of their Fifth Amendment due process rights.

As for the first ground, each of the Petitioners claimed that § 1226(a) governs their detention. They argued that although they were statutorily "applicants for admission," they were not "seeking admission" under § 1225(b)(2)(A), and thus they fell instead under the default rule of detention supplied by § 1226(a). The Government replied that § 1225(b)(2)(A) extends to all unadmitted aliens, because an "applicant for admission" is necessarily "seeking admission." It observed that under the ordinary meaning of both phrases, one who "applies" for something is inherently "seeking" it.

On October 27, 2025, the district court granted both petitions for habeas corpus. Interpreting the INA, the court concluded that § 1226 governed Petitioners' detention, thus entitling each of them to a bond hearing. It made no finding on Petitioners' other grounds for relief. The Government filed notices of compliance in November 2025, indicating Petitioners had been granted bond hearings and were subsequently released from DHS custody.

This timely appeal followed.  On November 25, 2025, the Government moved to consolidate both appeals.  We granted the motion on December 11.

On January 5, 2026, we asked whether the appeals had become moot in light of the Government's notices of compliance and the fact that Petitioners were granted a bond hearing.  Petitioners and the Government responded on January 19, and agreed that the consolidated appeals were not moot, since this Court could still grant relief to the Government by reversing the district court and allowing renewed detention.

On February 14, 2026, the Government moved to expedite oral argument or, alternatively, to submit the consolidated appeals on the briefs, observing that expeditious resolution was necessary given the "hundreds, if not thousands," of similar habeas claims filed in district courts all around the country, including in our Circuit.  Petitioners agreed to an expedited schedule but reiterated their request that this Court hold oral argument.  We granted the motion to expedite on February 26, and heard argument one month later.

## II.

We review our own jurisdiction de novo, and "always have an obligation to examine *sua sponte*" our power to hear a case before reaching the merits.  *Kelly v. Harris*, 331 F.3d 817, 819 (11th Cir. 2003).  In addition, we review de novo a district court's grant or denial of habeas corpus under 28 U.S.C. § 2241.  *Djadju v. Vega*, 32

F.4th 1102, 1105 (11th Cir. 2022).  Finally, the correct interpretation of a statute is a question of law that we also review de novo.  *Simone v. Sec'y of Homeland Sec.*, 156 F.4th 1212, 1216 (11th Cir. 2025).

As an initial matter, we must determine whether we have jurisdiction.  Our Court's jurisdiction is limited to "cases" and "controversies," which requires, among other things, that the issue has not become moot.  *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189–90 (11th Cir. 2011).  "[A]n issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief."  *Zinni v. ER Sols., Inc.*, 692 F.3d 1162, 1166 (11th Cir. 2012) (citation modified).  However, a party's voluntary compliance with an order does not usually render an appeal moot unless the appellate court cannot grant the parties any additional relief.  *See Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324, 1329 n.3 (11th Cir. 2024) (citing, *inter alia*, *Burnett v. Kindt*, 780 F.2d 952, 955 (11th Cir. 1986)).

Habeas petitions ordinarily present "a live case or controversy only when a petitioner is in custody."  *Djadju*, 32 F.4th at 1106–07 (citation modified).  Thus, when a petitioner is no longer being held, there must be a "concrete or continuing injury" or a "collateral consequence" for the suit to be maintained.  *Id.* (citation modified).  In *Djadju*, we held that a habeas petitioner's challenge to his detention during the pendency of his removal proceedings was rendered moot by his conditional release, as his "prayer for relief ha[d] been satisfied."  *Id.* at 1107.  Important to that holding, there was "no reasonable basis for [the Court] to believe" that the

12                    Opinion of the Court                    25-14065

petitioner would be "re-detained unlawfully upon termination of [his] suit." *Id.* at 1109.

*Djadju* was a *petitioner's* appeal, not the Government's. *Id.* at 1105. That petitioner had gotten what he wanted, so there was nothing more this Court could do for him. Here, the Government did not get what it was seeking -- Petitioners were released on bond over its objection. So, this Court could still offer the Government relief; it could reverse the district court and give the Government the authority to re-detain the Petitioners (which it has expressed its unambiguous intention to do). *See Zinni*, 692 F.3d at 1166; *Greater Birmingham Ministries*, 105 F.4th at 1329 n.3.

We therefore have jurisdiction over the appeals, since the controversy has not become moot.

### III.

We turn, then, to the merits. When confronted with a question of statutory interpretation, our analysis principally turns on the text. *United States v. Moore*, 115 F.4th 1370, 1374 (11th Cir. 2024). Our Circuit has long recognized that "courts must interpret the relevant words of a statutory provision not in a vacuum, but with reference to the statutory context, structure, history, and purpose of the law." *Perez v. Owl, Inc.*, 110 F.4th 1296, 1308 (11th Cir. 2024) (citation modified) (quoting *Abramski v. United States*, 573 U.S. 169, 179 (2014)); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7–8 (2011). Thus, to discern which provision

is applicable to Petitioners' detention, we look to (first and foremost) the text, then to the broader statutory structure, history, and, if necessary, to the congressional purpose of the INA as amended by IIRIRA.

*A.*

Beginning with the text, § 1225(b)(2)(A) does not apply to Petitioners. This conclusion follows from the application of three basic principles of statutory interpretation.

First, absent any evidence that a term carries a specific meaning, "those whose lives are governed by law are entitled to rely on its ordinary meaning, not left to speculate about hidden messages." *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025) (first citing *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017); then citing *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021)). The ordinary-meaning canon is "the most fundamental semantic rule of interpretation," and instructs us that "[w]ords are to be understood in their ordinary, everyday meanings -- unless the context indicates that they bear a technical sense." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (2012); *see also* JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 157–58 (1833).

Second, a corollary of the ordinary-meaning canon is that where a term carries a technical or specific meaning, a court must apply that meaning, even if doing so is counterintuitive or contrary to the term's ordinary meaning. SCALIA & GARNER, *supra*, at 73–77. After all, "statutory terms can carry meanings that depart from

their ordinary ones." *Feliciano*, 605 U.S. at 45. Thus, for example, Congress may "define a word or phrase in a specialized way or employ a term of art with long-encrusted connotations in a given field." *Id.* And "[w]hen Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" *Dep't of Ag. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) (quoting *Sturgeon v. Frost*, 587 U.S. 28, 56 (2019)). This is especially so where, as in the case of the INA and IIRIRA, the statute is replete with technical terms that bear little resemblance to their ordinary, everyday usage.

Finally, "[i]t is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (citation modified); *see Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 236 (2011). When reading statutory text, "every word and every provision is to be given effect," and "[n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence," since we presume Congress acts intentionally in drafting the language of its laws. SCALIA & GARNER, *supra*, at 174; *see also United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used.").

With these principles in mind, we begin with the text at issue here, drawn from § 1225(b)(2)(A). The provision reads, in relevant part:

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). The competing interpretations of this provision offered by the Government and Petitioners require us to examine and compare two critical phrases -- "an alien who is an applicant for admission" and "an alien seeking admission" -- to determine what conditions justify an alien's detention pursuant to § 1225(b)(2)(A).

The Government argues that under the ordinary meaning of the two phrases, it is clear they denote only one condition. It maintains that all "applicants for admission" are "seeking admission," since one who applies for something is necessarily seeking it. It offers the example of a college applicant, who by applying to college is necessarily "seeking admission" to that college. Two of our sister circuits have found this reasoning persuasive, concluding that "the ordinary meanings of the phrases 'applicant for admission' and 'seeking admission' are the same." *Avila*, 170 F.4th at 1134; *see also Buenrostro-Mendez*, 166 F.4th at 502. Those courts said that "'apply' means '[t]o make a formal request,' while 'seek' means 'to request, ask for.'" *Avila*, 170 F.4th at 1134 (citation modified); *see Buenrostro-Mendez*, 166 F.4th at 502.

If our task ended with the ordinary meaning of the two phrases, we would agree that they are synonymous. However, as

with many other terms found in the INA, we are required to look beyond ordinary meaning, because Congress has chosen to define the phrase "applicant for admission" in a technical and specific way. Section 1225(a)(1) defines the term to mean "[a]n alien present in the United States who has not been admitted or who arrives in the United States," whether or not the alien has "applied" for something in common parlance. On the face of the text, no actual "application" is necessary to be an applicant for admission -- nor, for that matter, is any other affirmative step required on the part of an alien. Rather, the statute defines "applicant for admission" to be a passive condition, and "deems"[2] an alien to be an applicant merely by arriving or being present in the United States without having been admitted. In reading § 1225(b)(2)(A), then, we cannot accept

---

[2] Congress's use of the word "deemed" confirms that the term "applicant for admission" is a technical one. To "deem" something is to "treat [it] as if (1) it were really something else, or (2) it has qualities that it does not have." *Deem*, *v.*, BLACK'S LAW DICTIONARY (7th ed. 1999). The word is "a useful word when it is necessary to establish a legal fiction either positively by 'deeming' something to be what it is not or negatively by 'deeming' something not to be what it is." *Id.* (citation modified); *see Sturgeon*, 587 U.S. at 47 (public lands were "deemed" to be parkland, and "non-public lands (everything else) were, by negative implication, 'deemed' not" to be). Thus, Congress has told us to ignore what ordinarily constitutes an "applicant for admission," and instead "deem" any arriving alien or present unadmitted alien to be an applicant, to the exclusion of all other aliens who might otherwise be considered applicants. *See Sturgeon*, 587 U.S. at 47. This legal fiction functions not in spite of the term "applicant for admission" carrying its ordinary meaning, but precisely because it does not. Where Congress has given a term a specialized meaning, we are obliged to follow it.

the ordinary meaning of "applicant for admission" -- rather, an "alien who is an applicant for admission" means one who is "arriving" or just "present in" the country without admission.

We consider next the second phrase, "an alien seeking admission." Congress has not specifically defined "seeking." The term, which functions as an adjectival modifier of the noun "an alien,"[3] must be afforded its ordinary meaning -- indicating an affirmative step of search or pursuit. *Seek*, *v.*, Oxford English Dictionary, https://www.oed.com/dictionary/seek_v [https://perma.cc/9MMT-73L9] (last visited Apr. 10, 2026) ("To go in search or quest of; to try to find, look for . . . [a] person, thing, or place . . ."); *see also Seek*, *v.*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/seek [https://perma.cc/V3ZM-7MKV] (last visited Apr. 10, 2026). That the word is written as a present participle ("seeking") underscores that it is describing some active and temporally ongoing step or process on the part of the alien. *See Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1307 (11th Cir. 2022) ("A present participle is used to signal present and continuing action."); *Carr v. United States*, 560 U.S. 438, 448 (2010) (looking to verb tense to discern temporal reach).

Moreover, the remainder of the phrase "alien seeking admission" clarifies the type of pursuit that is relevant for § 1225(b)(2)(A) to apply. While the INA does not define the joint phrase "seeking

---

[3] As defined in the INA, an "alien" refers to "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

18                          Opinion of the Court                          25-14065

admission," it clearly denotes the object of the alien's pursuit by defining the technical term "admission" in this way:

> The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.

8 U.S.C. § 1101(a)(13)(A).  So, the complete phrase "an alien seeking admission" refers to an alien who is pursuing "lawful entry . . . into the United States after inspection and authorization by an immigration officer."  This also means that the phrase "clearly and beyond a doubt entitled to be admitted" refers to an entitlement to "lawful entry" following inspection.  *Id*. § 1225(b)(2)(A).

Beyond its definition in the INA, "admission" bears "long-encrusted connotations" in the field of immigration law.  *Feliciano*, 605 U.S. at 45.  As the Supreme Court recently explained in *Sanchez v. Mayorkas*, 593 U.S. 409 (2021), an alien's status as "admitted" conveys more than a right to lawfully remain in the United States -- indeed, there are many forms of "lawful status" that grant an alien the right to remain, yet do not necessarily amount to "admission," such as asylum and temporary protected status ("TPS").  *Id*. at 415 (holding that "[l]awful status and admission . . . are distinct concepts in immigration law," and "[e]stablishing one does not necessarily establish the other").  Within the broad scheme of the INA, a grant of admission carries a bundle of rights and privileges not available to those who bear other lawful statuses.  Among other things, admission potentially renders an alien eligible to adjust his

status to that of a lawful permanent resident ("LPR"),[4] *see id.* at 415–16; 8 U.S.C. § 1255(a); 8 C.F.R. § 245.1(b)(3), and shifts the burden of proof in removal proceedings. Unadmitted aliens must prove "clearly and beyond a doubt" that they have a right to admission, whereas the Government has the burden to prove admitted aliens are deportable. 8 U.S.C. § 1229a(c)(2); 8 C.F.R. § 1240.8(a).

To seek "admission," then, is a legally salient act under the INA. The consequences of doing so stretch beyond securing a right to enter or remain in the United States, since that right may be afforded on many other grounds that do not constitute admission. *See, e.g.*, *Sanchez*, 593 U.S. at 415; 8 U.S.C. §§ 1158(c)(1), 1254a(a)(1)(A) (instructing that aliens with asylum or TPS shall not be removed). Instead, the act of seeking admission constitutes the pursuit of "lawful entry . . . after inspection and authorization by an immigration officer," and all the rights and privileges that follow from lawful entry, which is quite distinct from seeking another lawful status. 8 U.S.C. § 1101(a)(13)(A). This tees up a legal fiction of considerable importance in the INA -- an alien may be lawfully present in the United States, but nevertheless not "admitted."

Putting the pieces together, the plain text of § 1225(b)(2)(A), as supplemented by the definitions chosen by Congress in the INA,

---

[4] Although an alien who was never granted admission may still apply for LPR status, approval in that case is difficult, and requires an immigration judge to forgive the alien's original illegal entry. *See* 8 U.S.C. § 1255(i); *Patel v. Garland*, 596 U.S. 328, 332 (2024).

yields this command: an alien shall be detained for a § 1229a proceeding if he (1) is arriving in the United States or is present in the United States without having been granted lawful entry; (2) is seeking lawful entry after inspection and authorization by an immigration officer; and (3) is not clearly and beyond a doubt entitled to lawful entry, as determined by the examining immigration officer. *See id.* § 1225(b)(2)(A). When read this way, the function of the provision is clear -- arriving or present aliens who are seeking to be inspected and granted lawful entry must demonstrate that they are "clearly and beyond a doubt entitled" to get it, else they will be detained and referred by the inspecting officer for a proceeding before an immigration judge to determine whether or not they are *in fact* entitled to lawful entry. This understanding gives every word and clause found in § 1225(b)(2)(A) full meaning and effect, and uses the definitions supplied by Congress.

Applying this construction, it seems to us that Petitioners do not fall within the scope of § 1225(b)(2)(A). All agree that Petitioners satisfy the first condition of being "present in the United States without having been admitted," because they were discovered in the interior but were never granted lawful entry. However, on this record, we cannot also say that they were "seeking lawful entry after inspection and authorization by an immigration officer" when they were detained. Petitioners were not applying for entry in any literal sense when they were detained following a traffic stop, nor were they taking any cognizable step to obtain the rights and privileges of lawful entry. They were only present in the country.

They were not seeking or pursuing any object, let alone "lawful entry."

The Government argues, nevertheless, that Petitioners' mere presence in the interior transforms them into applicants who are "seeking admission," since applicants for admission may withdraw their application by simply leaving the country. This reading runs contrary to both the ordinary meaning of "seeking," which, after all, requires taking an affirmative step or commencing some process, *see Westchester Gen. Hosp.*, 48 F.4th at 1307, and the particularized meaning Congress has given to the word "admission," a legally significant status that transcends simply the right to remain in the country. As we see it, the Government has conflated the passive condition of "presence" with actively "seeking" something specific, in contravention of the actual words and definitions Congress chose.

Moreover, it is indisputable that there are many other ways to be lawfully present in the United States under the INA, without having been lawfully admitted into this country. Because admission confers benefits beyond lawful presence in the United States, the INA recognizes many shades of gray between an alien who is unlawfully in the United States and one who has been "admitted." Consider some examples. First, DHS "may grant [an] alien [TPS] . . . and shall not remove the alien from the United States during the period in which such status is in effect." 8 U.S.C. § 1254a(a)(1). Second, an alien may be granted asylum if he demonstrates a credible fear of being persecuted on account of his

"race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1158(b)(1)(B), (c)(1)(A). Third, the INA provides pathways to obtain nonimmigrant visas for cooperating criminal witnesses, victims of human trafficking, and victims of domestic abuse. *See id.* §§ 1101(a)(15)(T)–(U), (a)(51), 1154(a)(1)(A)(iii), (B)(iii), (D)(i)(II), 1158(d)(2). Finally, an alien ordered removed may seek a deferral or withholding of removal if, for instance, DHS determines that the "alien's life or freedom would be threatened," *id.* § 1231(b)(3)(A), such as by violent persecution under the Convention Against Torture, 8 C.F.R. §§ 208.16(a), 208.17(a).[5]

The Government's proffered reading would create a binary choice for unadmitted aliens present in the interior: they either seek admission or they voluntarily self-deport. Yet any fair and thorough review of the complex text of the INA yields the observation that an alien present in the United States may inhabit many other statuses that do not amount to an admission, but which nevertheless confer a lawful basis to remain in the United States. We think the binary choice offered by the Government has oversimplified the broad and multifaceted nature of the INA. It has pared

---

[5] DHS may also protect certain aliens through deferred action under national immigration enforcement policies and priorities, such as Deferred Action for Childhood Arrivals ("DACA"). 8 C.F.R. § 236.21(c)(1).

down the branching pathways of classifications of present aliens into the single divergent status of admitted or not.[6]

The Government returns to the example of a college applicant, suggesting that the college applicant necessarily seeks admission to college.  Again, this example is driven by giving these words their ordinary meaning, even though in this case the critical phrase "applicant for admission" has a particularized and technical meaning chosen by Congress.  Thus, we think the better example is the one supplied by the Petitioners.  Suppose a statute defined a "registered voter" as "a person aged eighteen or older, who is listed and in good standing on the roll of registered voters maintained by their state of residence."  Then suppose the statute provided that "any registered voter seeking to vote in an election shall submit to an inspection."  On a review of the statute's ordinary meaning, it is natural to think that a "registered voter" is "seeking to vote," since

---

[6] Indeed, the Government's reading would threaten the legal fiction that runs through the INA.  The INA's safe harbors permit some aliens to remain in the country notwithstanding the fact that they were never "admitted."  So, these aliens would continue to be "applicants for admission" for however long they remain in the United States.  8 U.S.C. § 1225(a)(1).  If the Government's reading were correct, it seems these aliens would therefore be subject to mandatory detention under § 1225(b)(2)(A), since the relevant inquiry would begin and end with whether they were admitted, or else whether they are "clearly entitled" to admission.  This would read out all statutory nuance.  Even if an alien secures TPS, asylum, or a deferral of removal, under the Government's reading, he nevertheless "shall be detained" until he can establish "clearly and beyond a doubt" a right to be admitted, or is granted humanitarian parole.  *Id.* § 1225(b)(2)(A).

a voter is a "person who votes." *Voter, n.*, Oxford English Diction-ary, https://www.oed.com/dictionary/voter_n [https://perma.cc/88F8-B4PM] (last visited Apr. 10, 2026). And yet, the statute's definition of "registered voter" counteracts that ordinary meaning; one can satisfy the statutory conditions of being a "registered voter" by being on the state's registered voter roll, above eighteen years of age, and in good standing. None of those conditions require the voter to vote -- indeed, the statute does not require any affirmative act from a registered voter at all.

This example tracks the INA's own statutory scheme. Section 1225(b)(2)(A) pairs an active, present-tense condition with a passive term of art, so that the two do not overlap by default. Just as one can be both a "registered voter" and one who is "seeking to vote," an alien may well be an "applicant for admission" who is also "seeking admission." But not necessarily. Not all voters need vote in every election, and analogously, not all aliens "present in the United States" without having been admitted are "seeking admis-sion." The phrases denote distinct conditions.

The provision's grammatical structure confirms our read-ing. It outlines two conditions with differing grammatical frame-works, so that each must be independently met. Most obviously, both "applicant for admission" and "seeking admission" are intro-duced by *separate* conditional phrases. The provision begins "*in the case of* an alien who is an applicant for admission," and continues with "*if* . . . an alien seeking admission is not clearly and beyond a doubt entitled to be admitted," giving rise to two prerequisites. 8

U.S.C. § 1225(b)(2)(A) (emphasis added).  The second condition also lacks any definite article, such as "the," "this," or "such," which would indicate that the "alien seeking admission" is necessarily the *same* alien who is an "applicant for admission."  *See, e.g.*, *Nielsen v. Preap*, 586 U.S. 392, 407–08 (2019) (plurality opinion) (interpreting "the" in "the alien" to be "a function word" that "a following noun or noun equivalent is definite or has been previously specified by context").  Instead, the provision refers to "an" applicant for admission (denoting a first category) and "an" alien seeking admission (denoting a second category).  Small variations in grammar can make all the difference in giving text its most accurate meaning.

The Government's proffered reading also renders the phrase "an alien seeking admission" surplusage in the operation of § 1225(b)(2)(A), "an interpretative no-no."  *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011) (citations omitted); *see also Williams*, 529 U.S. at 404.  Again, when reading a statute we are obliged to give each word and phrase independent meaning wherever possible.  If Congress in fact wanted an alien's status as an "applicant for admission" to be the sole condition for no-bond detention, it could have simply written the provision this way:

> [I]f the examining immigration officer determines that *an applicant for admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

Congress chose another path.  Section 1225(b)(2)(A) first establishes the general pool of aliens to whom the provision applies ("in the case of an alien who is an applicant for admission"), only to subsequently impose a *second* condition limiting that pool to "alien[s] seeking admission."  On this circuitous and layered text, we cannot conclude that Congress wanted us to ignore an express condition of the provision and equate two phrases with different words, one of which it has specifically defined, to require detention for every unadmitted alien.[7]  For "[i]f Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote."  *Biden v. Texas*, 597 U.S. 785, 798 (2022).

The Government downplays the importance of the canon against surplusage, declaring that it is not a "silver bullet."  Doubtless, redundancies in law can happen, and where otherwise clear text steers us toward repetition, we need not veer out of the way -- especially when the redundant phrases are synonymous.  *See Heyman v. Cooper*, 31 F.4th 1315, 1322 (11th Cir. 2022).  But here, the plain text cuts against the Government.  Congress employed two

---

[7] Our dissenting colleague suggests that our reading -- that "applicant for admission" imposes a distinct condition from the phrase "alien seeking admission" -- renders the inclusion of present aliens in the definition of "applicant for admission" surplusage throughout § 1225.  But the phrase appears in its unqualified form several times in § 1225, where the statute applies to all applicants.  Thus, for instance, as outlined in § 1225(a)(3), all applicants for admission shall be inspected, whether or not they are seeking admission.  8 U.S.C. § 1225(a)(3); *see also id*. § 1225(a)(2) (stowaways are not applicants for admission regardless of what they are seeking).  And more broadly, a present alien *could* seek admission -- he just doesn't *have* to, on the INA's text.

different phrases, introduced by separate conditional terms, which carry distinct definitional meanings within the statute. They are not "synonymous" on the text supplied. *See* SCALIA & GARNER, *supra*, at 170 ("[A] material variation in terms suggests a variation in meaning.").

Finally, the Government theorizes that "seeking admission" is itself a term of art that subsumes all "applicants for admission." This position is also unsupported by the text. To discern whether a phrase is a term of art, we consider what evidence of particularized usage is present, including specialized definitions or "long-encrusted connotations in a given field." *Feliciano*, 605 U.S. at 45. Again, the INA does not define "seeking admission," only "admission." That definition makes it abundantly clear that Petitioners were not "seeking admission," that is, seeking "lawful entry following inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

The other uses of "seeking admission" within § 1225 also do not support the Government's interpretive theory.[8]  Outside of

---

[8] In addition, while "seeking admission" appears elsewhere in the statute, it is not given a specialized meaning beyond its ordinary one, as supplemented by the definition of "admission": that the phrase denotes a class of aliens taking some affirmative step to gain lawful entry into the United States. *See, e.g.*, 8 U.S.C. § 1182(d)(3)(A) (proclaiming that an otherwise inadmissible foreign national "who is in possession of appropriate documents . . . and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant"); *id.* § 1101(a)(13)(C) (lawful resident is not seeking admission unless certain conditions are met). And to the extent the joint phrase carries a clear meaning within the general field of immigration law, this meaning likewise

Opinion of the Court                      25-14065

§ 1225(b)(2)(A), the phrase appears only twice.  First, in a subparagraph titled "Statements," the section states:

> An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant *in seeking admission to the United States*, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

8 U.S.C. § 1225(a)(5) (emphasis added).  The usage of "seeking admission" in this context further suggests that the phrase refers to one who is actively seeking to enter the United States.  After all, the questions supplied -- length of stay, purpose of entry, and inadmissibility status -- are only relevant to those who have not yet entered the country.  Moreover, that "applicant for admission" is described separate and apart from the phrase "seeking admission" again indicates that the two are not coterminous; an applicant may be seeking admission, and thus "may" be asked by an inspecting officer for their "purposes and intentions" "in seeking admission to the United States," but does not have to be.

Second, "seeking admission" appears in the inspection provision of § 1225(a)(3).  That subparagraph reads this way:

---

aligns with the ordinary meaning.  *See, e.g.*, *Alvarado v. U.S. Att'y Gen.*, 984 F.3d 982, 986 (11th Cir. 2020) (describing two aliens arriving at a port of entry as "seeking admission to the United States").

> All aliens (including alien crewmen) who are applicants for admission *or otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers.

8 U.S.C. § 1225(a)(3) (emphasis added).  In what is perhaps its strongest textual argument, the Government cites the phrase "or otherwise seeking admission" from this provision, claiming that being an applicant for admission is necessarily a subset of those "seeking admission," and thus being an applicant for admission satisfies the condition of "seeking admission" in § 1225(b)(2)(A).

At the outset, even if this reading of § 1225(a)(3) were correct, it would not contravene the plain text of § 1225(b)(2)(A).  For the reasons we have explained at some length, § 1225(b)(2)(A) lists "applicant for admission" and "seeking admission" as discrete and separate conditions for detention.  The most the inspection provision of § 1225(a)(3) can offer is further illumination of the relationship between "applicant for admission" and "seeking admission."  By insisting that we must effectively read "seeking admission" out of § 1225(b)(2)(A) on account of language found in a different provision, the Government offers a reading that fails to produce a "harmonious whole." *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959); *see also Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 569 (1995) (courts are obliged to read statutes "as a symmetrical and coherent regulatory scheme"); SCALIA & GARNER, *supra*, at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

Furthermore, there are two different ways to read the ambiguous phrase "or otherwise." The Government focuses on the standalone meaning of the word "otherwise" as "in a different way or manner," and so proposes to read the phrase "or otherwise" in § 1225(a)(3) to mean that being an applicant for admission is necessarily one way to be "seeking admission." By doing so, it requires us to ignore the critical language found in § 1225(b)(2)(A). There is, however, a second, equally accepted and quite distinct reading of "or otherwise." As a joint term, the phrase can also "refer to something that is different from something already mentioned." *Or otherwise*, *idiom*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/or%20otherwise [https://perma.cc/BQ3Q-7L37] (last visited Apr. 10, 2026); *see also Or otherwise*, *idiom*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/or-otherwise [https://perma.cc/4U7U-PKKF] (last visited Apr. 10, 2026) ("[R]efer[ring] to the opposite of the word that comes before it."); *Or otherwise*, *adverb*, Oxford English Dictionary, https://www.oed.com/dictionary/otherwise_n [https://perma.cc/FYD9-52T3] (last visited Apr. 10, 2026) (defining "or otherwise" to "signify a corresponding word, thing, idea, etc., of opposite or alternative meaning," "the converse"). Indeed, in other statutes, Congress has used the phrase "or otherwise" to broaden a provision to include other, different conditions, especially when "otherwise" is followed by a series of terms. *See, e.g.*, 38 U.S.C. § 8102(b) ("No medical facility may be constructed *or otherwise* acquired *or* altered except [under certain circumstances]."

(emphasis added)).  And the Supreme Court has rejected a purely subsumptive reading of "or otherwise" in other contexts, including where, as here, the term following "or otherwise" "captures material that does not fit neatly into the statute's enumerated categories but is nevertheless meant to be covered."  *Cunha*, 2026 WL 1146044, at \*9 (quoting *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 125 (2019)).

Thus, § 1225(a)(3) provides that any applicant for admission, along with any alien who is seeking admission, readmission, or transit through the United States, shall be inspected, to ensure that "[a]ll aliens" -- no matter their goal upon arrival at the border -- will be inspected.  This reading is wholly consonant with both the actual subject of § 1225(a)(3) ("Inspection"), and the broader focus of § 1225 itself -- which, given its title, concerns the inspection of "arriving aliens."[9]  And by preserving the distinction between "applicants for admission" and "alien[s] seeking admission," this reading harmonizes § 1225(a)(3) with § 1225(b)(2)(A).  It does not displace the "seeking admission" language in § 1225(b)(2)(A) by importing in a technical meaning from a related but collateral provision on

---

[9] The section's full title is "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing."  8 U.S.C. § 1225.  Section 1225(a) is also titled "Inspection," and if Congress could not be any clearer, § 1225(a)(3) is *again* titled "Inspection."  *Id.* § 1225(a)(3).  Titles may "shed light on some ambiguous word or phrase," *Bhd. of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947), and are "permissible indicators of meaning," SCALIA & GARNER, *supra*, at 221.  In this case, all the titles point not to a technical meaning of "seeking admission" buried in § 1225(a)(3), but instead to merely a description of the aliens who must be inspected.

inspection.  *See Mandel Bros., Inc.*, 359 U.S. at 389; *Gustafson*, 513 U.S. at 569.

Our reading of "or otherwise" also has the added virtue of statutory modesty.  When evaluating interpretations of an agency's statutory authority, a court must greet claims to the exercise of great power with greater skepticism.  *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power . . . [courts] typically greet its announcement with a measure of skepticism.").  The Supreme Court has long distinguished between "everyday exercise[s] of federal power" and "extraordinary cases" where the impact of the authority claimed is vast.  *Nat'l Fed. of Ind. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) (per curium) (citation modified); *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  In an extraordinary case, the nature of our review may change, since we "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (citation modified).

Here, the Government's theory relies on the "oblique [and] elliptical language" of "or otherwise" to justify a new and "fundamental" change to the detention provisions found in the INA.  *West Virginia*, 597 U.S. at 723.  The Government would have us believe that Congress effected a mass detention campaign of every unadmitted alien present in the country, not by simply commanding that *every* applicant for admission be detained, nor by including the

phrase "seeking admission" within the definition of applicant for admission, *see Castañon-Nava*, 161 F.4th at 1061, but instead by joining "applicant for admission" with "seeking admission" (and several other distinct terms, in the conjunctive) in a different part of the statute, which itself says not a word about detention. This reading "taxes the credulity of the credulous," falling well short of clear congressional authorization. *Maryland v. King*, 569 U.S. 435, 466 (2013) (Scalia, J., dissenting). It produces a paradigmatic "elephant in a mousehole" that we are reluctant to embrace, hiding a sweeping reorientation of § 1225 inside an otherwise innocuous and separate provision that only addresses inspection. *See Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions . . . ."). Not surprisingly, we remain skeptical that § 1225(a)(3) carries the "hidden message[ ]" the Government posits.[10] *Feliciano*, 605 U.S. at 45.

To bolster its interpretation, the Government relies on *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (11th Cir. 2016) (en banc). In that case, we held that the phrase "or otherwise" can connect a statute's verbs so as to subsume a first listed action into a

---

[10] Contrary to the dissent's characterization, our conclusion does not rely on the major questions doctrine. The principles of skepticism that we recount were adopted by the Supreme Court before the major questions doctrine took on its present form. They have long instructed us to exercise some caution before reading unclear statutory text in a manner that would yield sweeping consequences for the rest of the statute. *See Whitman*, 531 U.S. at 468. We do no more than apply those longstanding principles.

second one. *Id.* at 963. But *Villarreal* is of no help in this case, since we are confronted with a markedly different statutory structure. For one thing, the subsuming quality of "or otherwise" in *Villarreal* was perfectly consistent with the statute's broader focus and text, and did not (unlike in this case) introduce a real tension into the statute by producing an atextual result in a separate provision. *See id.* at 963, 966 (noting "[s]tatutory context confirms [the] reading" of "or otherwise"). For another, in that case the "or otherwise" language was the central text at the heart of the parties' dispute, rather than a different and ancillary mention of "or otherwise" outside of the disputed text. *See id.* at 963 (describing "or otherwise" as the "key phrase" to interpret in the contested provision).[11]

Nor is the Government's citation to *Villarreal* consonant with § 1225(a)(3)'s grammatical structure. Unlike in that case, here the provision includes "a mix of parts of speech: the noun 'applicants for admission' alongside the adjectival present participle

---

[11] The Government's narrow focus on "seeking admission" as the subsuming term is also logically unsupported by the full text of the provision. Its reading might be more persuasive if the provision at issue followed the structure of "A or otherwise B." This would denote a clear referent ("A") subsumed by a secondary concept ("B"). Instead, § 1225(a)(3) says more. *See Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012) ("[T]he first rule of . . . statutory interpretation is: Read on."). The full text requires inspection of aliens "who are applicants for admission or otherwise seeking admission *or readmission to or transit through the United States*." 8 U.S.C. § 1225(a)(3) (emphasis added). So, the structure is: "A or otherwise B *or* C *or* D." This does not mean all applicants are necessarily seeking admission.

'seeking' and participial phrase 'seeking admission or readmission.'" *Buenrostro-Mendez*, 166 F.4th at 518 (Douglas, J., dissenting); *contra Villarreal*, 839 F.3d at 963 ("This use of 'or otherwise' *to connect verbs* is a familiar construction." (emphasis added)). "Thus, the subsection Congress actually wrote is more like saying, at the end of football season, 'All students who are football players or otherwise seeking to play football or cheerlead should come to the gym for an info session this evening.'" *Buenrostro-Mendez*, 166 F.4th at 518. Although "[i]n a grammatical void, we might be tempted to equate 'football players' with 'students seeking to play football,' or deem the former a subset of the latter," those "players on the actual football team (the high school equivalent of a statutory term of art) would likely disagree." *Id.*; *see Villarreal*, 839 F.3d at 976–77 (Rosenbaum, J., concurring in part and dissenting in part).

The text of § 1225(b)(2)(A) is clear that mandatory detention applies only to a narrower category of applicants for admission: those seeking lawful entry into the United States. In sweeping Petitioners (and all unadmitted aliens present in the country) into § 1225(b)(2)(A)'s scope, the Government offers a false, binary choice between admission and self-deportation. Its textual comparison makes the critical error of adopting the INA's terms of art when it is convenient to do so (for instance, to render Petitioners "applicants for admission"), but ignoring those same terms of art and instead relying on a comparison of ordinary meanings to define the provision's outer bounds. *See Avila*, 170 F.4th at 1138 (Erickson, J., dissenting). As we see it, § 1225(b)(2)(A) does not apply to Petitioners or to other present aliens not seeking admission.

*B.*

"Statutory structure confirms our conclusion." *Biden*, 597 U.S. at 799. When interpreting a statute, it is incumbent upon the court to situate text in context, and consider the broader structural ramifications of a proffered reading. *See, e.g.*, *Kasten*, 563 U.S. at 7; *Perez*, 110 F.4th at 1308. Here, reading § 1225(b)(2)(A) to apply to all present unadmitted aliens would have real consequences for the broader statutory scheme, which cannot easily be reconciled with either the text of the INA or Supreme Court precedent.

Reading § 1225(b)(2)(A) to apply to all unadmitted aliens present in the country would shift the center of gravity for detention authority under the INA, transforming an ancillary catchall provision into the statute's chief detention mechanism, and blurring the line between two different detention pathways. The INA's text confirms that the two relevant sections on detention govern distinct classes of aliens: § 1225 applies to arriving aliens seeking entry at the border, whereas § 1226 applies to aliens unlawfully in the interior. By interpreting § 1225 to stretch far beyond the border and ports of entry, the Government vitiates this longstanding distinction.

On its face, § 1225, titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing," stakes out the provisions and procedures applicable to the nation's borders, describing how arriving and traveling aliens seeking to enter the United States are to be inspected, processed,

and -- when necessary -- detained or removed.  The section accomplishes this through two basic concepts: inspection and admission.  It begins with § 1225(a), titled "Inspection," which addresses definitions and procedures that inform the rest of § 1225: most importantly, as we have seen, it defines an "applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States."  8 U.S.C. § 1225(a)(1).  It explains that an "arriving alien who is a stowaway is not eligible to apply for admission . . . and shall be ordered removed upon inspection by an immigration officer," unless he applies for asylum.  *Id.* § 1225(a)(2).

Section 1225(a)(3) lays out the imperative that "[a]ll aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  *Id.* § 1225(a)(3).  Again, this provision, most naturally read, covers all potential classes of aliens at the border, ensuring that all are inspected.  *See supra* Part III(A).  Then, § 1225(a)(4) instructs that at any time, an alien "applying for admission" may "withdraw the application for admission" by departing from the United States.  *Id.* § 1225(a)(4).  Finally, § 1225(a)(5) notes that applicants for admission may be required to provide oath-sworn statements to immigration officers "in seeking admission to the United States," including about their "intended length of stay," whether they "intend[ ] to remain permanently or become a United States citizen," and whether they are inadmissible.  *Id.* § 1225(a)(5).

Section 1225 continues with § 1225(b), titled "Inspection of applicants for admission."  First, § 1225(b)(1), titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," lays out the procedure for the first class of aliens at the border: those subject to expedited removal proceedings.  Section 1225(b)(1)(A)(i) (titled "Screening") says that arriving aliens who lack proper papers or who possess fraudulent papers are removed "without further hearing or review," unless they claim asylum -- a procedure detailed throughout the subsequent sections.  *Id.* § 1225(b)(1)(A)–(B).

Only then does § 1225(b)(2) appear, titled "Inspection of other aliens."  It commands that an "alien who is an applicant for admission" "shall be detained for a proceeding" if he is "an alien seeking admission" and "if the examining immigration officer determines" that he is "not clearly and beyond a doubt entitled to be admitted."  *Id.* § 1225(b)(2)(A).  The Supreme Court has explained that this provision "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)," meaning those not subjected to expedited removal. *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).  This makes sense; even if an alien seeking admission has the necessary papers to pass screening, he may nevertheless be inadmissible on any number of other grounds.  Section 1225(b)(2)(A) ensures that these aliens do not slip through the cracks, and instead orders that they be detained for fuller review.

The remainder of § 1225(b)(2) reinforces its applicability to the border.  Section 1225(b)(2)(B) lays out certain exceptions for

crewmen, stowaways, and those "to whom [§ 1225(b)(1)] applies." Then, § 1225(b)(2)(C) narrows the field, explaining that applicants for admission described in § 1225(b)(2)(A) (that is to say, those "seeking admission") who are "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States" may be returned to that territory pending the completion of a § 1229a proceeding. This provision indicates that § 1225(b)(2)(A) describes those entering the United States, specifically applying to a subset of that group: those arriving by land from a contiguous territory.

Finally, the last provisions of § 1225 lay out additional procedures for border inspection. Section 1225(c) ("Removal of aliens inadmissible on security and related grounds") concerns the removal of arriving aliens who "may be inadmissible" on an expedited basis for certain security-related concerns. 8 U.S.C. § 1225(c)(1). And § 1225(d) ("Authority relating to inspections") authorizes border agents to conduct routine inspections, including "board[ing] and search[ing] any vessel . . . or vehicle in which they believe aliens are being brought into the United States." *Id.* § 1225(d)(1).

In view of this text, § 1225 seems to us to have been designed by Congress to govern arriving aliens. It lays out the procedures and authority for officers to inspect arriving vessels and people, couching its scope in the language of "arriving aliens," "alien[s] seeking admission," and aliens seeking "transit through the United States."

Section 1226, conversely, supplies a different rule of detention that applies to aliens DHS seeks to remove from the interior. Recall that § 1226(a) authorizes DHS to detain any alien "pending a decision on whether the alien is to be removed from the United States." This language applies to both admitted and unadmitted aliens, since either may be subject to removal proceedings. *See id.* § 1229a(a)(1)–(2), (c)(2)(A), & (e)(2)(A). While the Government claims that § 1226(a) applies only to aliens who were first admitted, nothing in the provision itself supports this reading. The statute uses the catchall term "removed," bolstering the provision's role as a default rule of detention.

Section 1226(c) then limits the detain-or-release authority of § 1226(a), by rendering ineligible for release aliens who are either "inadmissible" or "deportable" for the reasons enumerated in the statute. *See id.* § 1226(c). Following the recent passage of the Laken Riley Act, Pub. L. 119-1, 139 Stat. 3 (2025) (codified at 8 U.S.C. § 1226(c)(1)(E)), Congress expanded the mandatory detention provisions of § 1226(c) specifically to include present, unadmitted aliens who were convicted of or charged with certain offenses. Thus, the provisions of § 1226 set out a general rule of detention for aliens -- like Petitioners -- who are suspected of being unlawfully in the interior, granting DHS authority to detain those aliens at its discretion pending removal proceedings, subject to the bond and conditional parole provisions of § 1226(a)(1)–(2).

The Supreme Court reinforced this general understanding in *Jennings v. Rodriguez*, 583 U.S. 281 (2018). There, the Court considered whether the Ninth Circuit correctly applied the constitutional avoidance canon in interpreting § 1225(b)(2)(A) and § 1226(c) to require periodic bond hearings. *Id.* at 285, 292, 304. The Government argued that "[i]n virtually all cases, Section 1225(b) is applied to aliens seeking initial entry." Supplemental Brief for Petitioners at 4, *Jennings*, 583 U.S. 281 (No. 15-1204). And at oral argument, the Solicitor General explained that § 1226 applied to aliens in the interior. *See* Transcript of Oral Argument at 7–8, 12, *Jennings*, 583 U.S. 281 (No. 15-1204) (Oct. 3, 2017) ("1226 is the provision that we use when we arrest somebody who is . . . within the United States; 1225 is the one we use when we are dealing with aliens who arrive at our shores.").

The Court agreed, opining that "[t]o implement its immigration policy, the Government must be able to decide (1) who may enter the country and (2) who may stay here after entering," a process that "generally begins at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible." *Jennings*, 583 U.S. at 286–87. It explained that § 1225 applies at the first step, sorting arriving aliens into classes to process and detain, and § 1225(b)(2)(A) was a "catchall provision." *Id.* at 286–88. Conversely, the Court observed that § 1226 "generally governs the process of arresting and detaining" aliens "present in the country," including aliens "who were inadmissible at the time of entry or who have been convicted of certain criminal offenses since admission." *Id.* at 288–89.

The Government insists that *Jennings* does not control, since its description of the INA is merely dicta. However, Supreme Court explications of governing principles of law cannot be so easily brushed aside. As we have said, "there is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). The Court's interpretation of the INA was not a passing, off-hand remark -- it was an expansive and detailed account of how the statute is best read. We are obliged to afford *Jennings* some weight in how to view the provisions at issue today. Moreover, that the Court construed the INA in this manner in reaching its ultimate holding again suggests why our reading of the relevant provisions is most natural. We are required, if possible, to give full meaning to both sections, and that is what *Jennings* did, at least in broad strokes.

The Government's interpretation cannot readily be reconciled with *Jennings*. Further, on its face, § 1226(a) embraces detention for admitted *and* unadmitted aliens, since either group may be "removed." *See* 8 U.S.C. § 1229a(a)(1). But if the Government's reading were correct, all unadmitted aliens would already be subject to mandatory detention under § 1225(b)(2)(A). This risk of redundancy gets worse when we factor in the language of § 1226(c), which exempts "inadmissible" and "deportable" aliens from release eligibility. The distinction is critical; "deportability" applies to admitted aliens, *see id.* § 1227(a) ("Any alien . . . *in and admitted to the United States* shall . . . be removed if the alien is within one or more of the following classes of *deportable* aliens[.]" (emphasis added)), whereas inadmissibility applies to unadmitted aliens, *see id.*

§ 1229a(a)(1)–(2), (c)(2)(A), & (e)(2)(A). Why, then, would § 1226(c) include exceptions for *both* deportable and inadmissible aliens, if the provision it limits (§ 1226(a)) only applies to admitted aliens? What's more, why would the Laken Riley Act target unadmitted aliens who were otherwise already included within the ambit of § 1225(b)(2)(A) by later adding a new and separate provision?

The Government offers three answers. None are persuasive. First, it points to places in the INA where deportability and inadmissibility intersect, arguing that the mention of inadmissibility in § 1226(c) "sweeps more broadly than Section 1225(b)(2)." The Government's chief example is § 1227(a)(1)(A), which states that "[a]ny alien who at the time of entry or adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time is deportable." It is unclear how this observation helps the Government. Section 1227(a)(1)(A) is not one of the included grounds in § 1226(c), and in any event, an alien admitted in error is not "inadmissible," he is "deportable." The example provides no clarity as to which "inadmissible" aliens remain subject to § 1226(c), but are not already subject to § 1225(b)(2)(A). Nor does this explain why, through the Laken Riley Act, Congress targeted aliens who are inadmissible for entering without inspection in § 1226(c), including those detained pursuant to § 1226(c)(1)(E).[12] *See id.* §§ 1226(c)(1)(E)(i), 1182(a)(6)(A)(i).

---

[12] In its Reply Brief, the Government also argues that "the specific governs the general," insisting that because § 1226(a) presents a broader rule of detention, § 1225(b)(2)(A) should prevail. However, the general/specific canon applies

Next, the Government suggests that § 1226(c) is in fact complimentary to § 1225(b)(2)(A), because it limits the humanitarian parole provisions of § 1182.  This argument is undermined by the Supreme Court's decision in *Nielsen v. Preap*, 586 U.S. 392 (2018) (plurality opinion), which rejected a Ninth Circuit ruling that any arrest pursuant to § 1226(c) must be effectuated immediately following an alien's release from criminal custody.  *Id.* at 396.  Just like in *Jennings*, the Court in *Preap* observed that § 1226(a) "sets out the general rule regarding [an alien's] arrest and detention pending a decision on removal," and grants "discretion either to detain the alien or to release him on bond or parole."  *Id.* at 396–97.  The Court was clear that § 1226(c) is "a limit on the authority conferred by subsection (a)," meaning "[a]ll relevant detainees" subject to § 1226(c) are "arrested by authority that springs from subsection (a)."  *Id.* at 409; *see also Jennings*, 583 U.S. at 289.

Beyond *Preap*, the Government overreads § 1226(c), asserting that the provision separately limits the Attorney General's humanitarian parole authority under § 1182.  As written, this limitation would not make much sense.  If Congress meant to limit the Attorney General's authority, it could well have done so in either § 1225(b)(2) or § 1182(d)(5) -- not in an ancillary provision that says nothing about either part of the statute.  *See King v. Burwell*, 576 U.S.

---

"when conflicting provisions simply cannot be reconciled."  SCALIA & GARNER, *supra*, at 183; *see CSX Corp. v. United States*, 18 F.4th 672, 683 (11th Cir. 2021).  Here, a conflict only arises on the Government's reading, where a separate account must be made for § 1226(c).

473, 497 (2015) (Congress does not change fundamental aspects of a regulatory scheme through "a winding path of connect-the-dots provisions"). After all, § 1182 parole already has enumerated exceptions to which Congress could have added if that were its intention. *See* 8 U.S.C. §§ 1182(d)(5)(B), 1184(f).

Finally, the Government tries to take the sting out of surplusage, contending that under either reading of the INA, there is overlap between § 1225 and § 1226. But as with the previous iteration of this argument, the Government tries to handwave away a fatal problem. On the Government's reading, every unadmitted alien -- whether a criminal or not -- is subject to mandatory detention under § 1225(b)(2)(A), even though a significant subset of that group is *also* subject to mandatory detention under § 1226(c). This is no small overlap, but a serious statutory redundancy. *See Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010); *Henderson v. United States*, 568 U.S. 266, 281 (2013) (Scalia, J., dissenting).

The Petitioners' reading is considerably more harmonious. On their view, § 1226 supplies the default rule of detention for an alien arrested and detained in the interior, whether he is being removed on grounds of deportability or inadmissibility. Section 1226(c), then, limits the alien's eligibility for bond or parole if he is deportable or inadmissible on one of the enumerated bases.[13] Section 1225(b)(2)(A), conversely, applies to an altogether distinct

---

[13] Because § 1226(c) applies separately from § 1225(b)(2)(A), nothing in our opinion suggests that an alien with criminal or terrorism-related charges is eligible for bond; he is not, as § 1226(c) makes clear in no uncertain terms.

group of aliens -- those who have not yet entered the United States, but are "seeking admission" at the border. Within that group, all are detained unless they are "clearly" entitled to admission, so they may be processed for a determination of admissibility. This reading gives effect to each section -- all parts work in concert, and no statutory gymnastics are required.

## C.

Finally, a review of the relevant history of the INA "confirms the plain import of its text." *Biden*, 597 U.S. at 804; *see also Niz-Chavez*, 593 U.S. at 165 (resolving residual "doubt . . . about the meaning of . . . two specific statutes" with "a wider look at IIRIRA's statutory structure and history"). Congress did not construct § 1225(b)(2)(A) from whole cloth -- the language finds deep roots in the country's historical immigration laws and practices.

"The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). As documented by *amici*, near the close of the nineteenth century, Congress expanded border agents' powers to specifically detain *arriving* aliens pending review. Brief for *Amici Curiae* Immigration Law Scholars in Support of Petitioners-Appellees [hereinafter, "ILS Br."] at 8. Thus, in the Immigration Act of 1893, Congress wrote that "it shall be the duty of every inspector of arriving alien immigrants to detain for a special inquiry . . . every person who may not appear to him to be clearly and beyond doubt entitled to admission," ch. 206, 27 Stat. 569, 570, first invoking the "clearly and

beyond a doubt entitled to be admitted" language still found in modern law, 8 U.S.C. § 1225(b)(2)(A). And in the Immigration Act of 1903, Congress added the "shall be detained" instruction, writing: "Every alien who may not appear to the examining immigrant inspector at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for examination in relation thereto by a board of special inquiry." Pub. L. No. 57-162, § 24, 32 Stat. 1213, 1219–20.

The INA of 1952 carried this language forward into the modern immigration regime. It provided that:

> Every alien . . . who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry to be conducted by a special inquiry officer.

Pub. L. No. 82-414, § 235(b), 66 Stat. 163, 199. When Congress revisited this language in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of the U.S. Code), it produced an iteration close to the one now in effect:

> Except as provided in subparagraph (B), if the examining immigration officer determines that an alien seeking entry is not clearly and beyond a doubt entitled to enter, the alien shall be detained for a hearing before a special inquiry officer.

*Id.* § 422(b)(2)(A), 110 Stat. at 1271.

Since 1893, Congress has employed some version of the language now before us in the INA. In each instance, the focal point has been on detention of arriving aliens. The various statutes have used analogous terms, such as "arriving alien immigrants," aliens "at the port of arrival," and "alien[s] seeking entry." Moreover, each of these iterations has employed the same standard of review: "clearly and beyond a doubt entitled" to land or enter. Thus, when Congress drafted IIRIRA in 1996, it should come as no great surprise that it used similar language it had applied unambiguously to arriving aliens for over a century of practice.

To make sense of this history, the Government argues, as it must, that IIRIRA changed everything. It insists that when revising the INA, Congress sought to eliminate any distinction between unadmitted aliens present in the interior and those arriving at the border, historically effectuated through the so-called "entry doctrine." The Government cites to a line from a House Judiciary Committee report, which commented that one aim of IIRIRA was to address the "equities and privileges in immigration proceedings that [were] not available to aliens who present[ed] themselves for inspection." H.R. REP. NO. 104-469, pt. 1, at 225 (1996). In addressing the distinction between unadmitted arriving aliens and those within the interior, the Government says, Congress must also have meant to overhaul how each group was detained, to avoid a "perverse incentive to enter."

25-14065                  Opinion of the Court                  49

However, the legislative record tells another story.[14]  Congress was clear that IIRIRA "modif[ied] the entry doctrine"; it did not discard the doctrine wholesale.  H.R. REP. NO. 104-879, at 107–08 (1997).  The beginning of the very sentence the Government relies on undermines its view, explaining that Congress sought to replace "certain aspects" of the doctrine.  H.R. REP. NO. 104-469 at 225.  And Congress was exceedingly clear about which parts of the entry doctrine it meant to target: namely, the discordant distinction between deportation proceedings and exclusion proceedings.

Under the old regime, those who entered without inspection and were later apprehended were subject to deportation proceedings, just like legal residents who later became deportable.  *Id.* at 226 ("Currently, aliens who have entered without inspection are deportable under section 241(a)(1)(B)."); H.R. REP. NO. 104-879 at 107–08 (bemoaning that unlawful aliens were "entitled to the same rights in deportation proceedings as a long-term legal resident of the U.S.").  Conversely, arriving aliens were historically subject to "truncated *exclusion* proceedings," which had "several procedural disadvantages as compared to those in deportability proceedings."  ILS Br. at 22 (citing *Landon v. Plasencia*, 459 U.S. 21, 26–27 (1982)).

Congress addressed this by centralizing removal proceedings.  H.R. REP. NO. 104-469 at 226.  It "eliminate[d] the distinction between 'exclusion' and 'deportation' proceedings," creating a

---

[14] We have looked at this legislative record only because the Government invokes it to assert that IIRIRA changed everything that came before.

new, "single form of 'removal' proceeding[s]" with "different burdens of proof assigned on the basis of the alien's status." H.R. REP. NO. 104-879 at 107–08. "Thus, an illegal alien would have the burden to prove his or her right to remain in the U.S., while in the case of a long-term permanent resident of the U.S., the burden would be on the Government to establish why the alien should be removed." *Id.* at 108. Within this new "admission doctrine," those "present in the United States who ha[d] not been admitted" and those "who arrive[d] in the United States" would all be subject to removal on the same procedural ground of inadmissibility. 8 U.S.C. § 1225(a)(1); H.R. REP. NO. 104-469 at 226, 228.

None of these important revisions, however, suggest Congress also sought to throw out the entry doctrine where federal detention authority was concerned. There is no evidence in the record that Congress anticipated, much less intended, that its revisions of § 1225 would mandate potentially the largest detention operation in the Republic's history. Rather, the record is replete with evidence that Congress intended for § 1225 to continue governing procedures for arriving aliens, laying out how aliens arriving in or traveling through the country are inspected, detained, and removed on an expedited basis. The House Judiciary Committee belabored this point, explaining how the revisions to the section changed the treatment of "arriving aliens."[15] H.R. REP. NO. 104-469 at 228–29; *see also* H.R. REP. NO. 104-828, at 33, 208–09 (1996).

---

[15] The law's final language mirrored this intent. Section 1225(b)(2)(A) recast the old language of AEDPA to incorporate the new admissibility doctrine into

25-14065                  Opinion of the Court                        51

Congress was also keenly aware of the limited detention resources available when drafting IIRIRA.  In expanding detention for criminal aliens under § 1226(c), it allocated funding for an additional five hundred beds in detention centers by the end of fiscal year 1997, and also added a special escape hatch for the Attorney General, so that enforcement of § 1226(c) could be delayed for up to two years if detention space proved to be insufficient -- an escape hatch the Attorney General actually used.  *See* IIRIRA §§ 303(b)(2), 386(a), 110 Stat. at 3009-586, 3009-653; H.R. REP. NO. 104-469 at 207; ILS Br. at 18.  No similar considerations were given for the sweeping detention provisions the Government says IIRIRA baked into § 1225.  If Congress really had sought to launch such a detention campaign, it's a wonder Congress did not factor in the scale of new detentions when it was crunching the numbers -- despite doing so to execute on a far narrower provision.  *See* H.R. REP. NO. 104-469 at 110–11, 119 (estimating at least four million aliens were unlawfully within the country).

The original purpose in passing IIRIRA is confirmed by nearly thirty years of unbroken executive practice.  "Since IIRIRA's

---

the existing framework, changing "seeking entry" to "seeking admission," and defining "admission" as "lawful entry."  *Compare* AEDPA § 422(b)(2)(A), 110 Stat. at 1271, *with* IIRIRA § 235(b)(2)(A), 110 Stat. at 3009-582.  And § 1226 detention pending "removal" "restate[d] the current provisions . . . regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States," an authority which had long applied to those who were never admitted.  H.R. REP. NO. 104-469 at 229; ILS Br. at 9.  These changes are consistent with Congress's stated aims.

enactment [twenty-nine] years ago, every Presidential administration" has interpreted § 1225(b)(2)(A) to apply only to people seeking admission, not those who have entered the country. *Biden*, 597 U.S. at 805. Shortly after IIRIRA's passage, the Department of Justice issued federal regulations to give meaning and effect to the law. It explained in clear terms that "[d]espite being applicants for admission, aliens who are present without having been admitted or paroled . . . will be eligible for bond and bond re-determination." Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,323 (Mar. 6, 1997). The Executive has long advised that "inadmissible aliens, except for arriving aliens, have available to them bond re-determination hearings before an immigration judge." *Id.*; 8 C.F.R. §§ 1003.19(a), 1236.1(d)(1).

To be sure, the usefulness of past executive interpretations is limited, since past practice does not allow us to ignore clear statutory language. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015). But that five presidential administrations over three decades have read IIRIRA to distinguish between arriving and present aliens[16] is "powerful evidence" that the reading "is natural

---

[16] The Government cites one BIA opinion and a different section of the Federal Regulations to suggest that earlier authorities considered § 1225(b)(2)(A) to apply to all unadmitted aliens. *See In re Lemus-Losa*, 25 I. & N. Dec. 734, 743 (BIA 2012) (noting that "seeking admission" may not require a literal request for permission); 8 C.F.R. § 235.3(b)(1)(ii). But in *In re Lemus-Losa*, the BIA interpreted a different part of the INA, and committed the same error the Government does here -- failing to give full effect to the phrase "seeking admission" under the statute. And it certainly did not represent an effort on the part

25-14065                 Opinion of the Court                 53

and reasonable." *Abramski*, 573 U.S. at 203 (Scalia, J., dissenting); *see also Bankamerica Corp. v. United States*, 462 U.S. 122, 130 (1983). The Supreme Court "has long said that courts may consider the consistency of an agency's views" to "weigh the persuasiveness of any interpretation it proffers in court," and has cautioned us that "[a] longstanding 'want of assertion of power by those who presumably would be alert to exercise it' may provide some clue that the power was never conferred." *Biden v. Nebraska*, 600 U.S. 477, 516 (2023) (Barrett, J., concurring) (first quoting *Bittner v. United States*, 598 U.S. 85, 97 (2023); then quoting *FTC v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941)).

Congress has also revisited federal immigration laws several times, yet never has it thought to correct this supposedly glaring oversight. Congress passed the Laken Riley Act just last year, which touched upon the same detention authority now in dispute. If ever there was a time to clarify the contours of § 1225 and § 1226, it was then. But Congress didn't do so; instead, it sanctioned Petitioners' reading by expanding mandatory detention through

---

of immigration authorities to deny bond to unadmitted aliens within the interior; rather, the Government made its prior position on the scope of § 1225 clear. *See supra* Part III(B). Similarly, the Government's invocation of 8 C.F.R. § 235.3(b)(1)(ii) is also unpersuasive, since that provision expressly applies to the expedited removal of aliens under § 1225(b)(1), not § 1225(b)(2)(A). *See* 8 C.F.R. § 235.3(b)(1) ("The *expedited removal provisions* shall apply to the following classes of aliens . . ." (emphasis added)). On this record, then, until the Government's recent change of heart, no prior executive actor clearly considered or contemplated § 1225(b)(2)(A) to apply to all unadmitted aliens.

§ 1226(c).  Where Congress revisits a law but leaves a "longstanding administrative construction . . . untouched," the lack of corrective action suggests Congress agreed with the construction in place.  *Saxbe v. Bustos*, 419 U.S. 65, 74 (1974); *see also Zemel v. Rusk*, 381 U.S. 1, 11 (1965).  Thus, the record evidence available leads us as well to reject the Government's ahistorical reading.

## IV.

As a final thought, the Government argues that even if the Petitioners are dead right in their interpretation of the INA, each of them qualifies as an alien who is "seeking admission" because, upon his arrest and the initiation of removal proceedings, he did not voluntarily self-deport.  It asserts that whatever affirmative step is required to "seek" admission to the United States, contesting one's removal assuredly counts, since an applicant for admission in § 1229a proceedings typically has the burden to establish his right to admission.

This argument fails at the gate.  Section 1225(b)(2)(A) makes it clear that an applicant for admission's status as one "seeking admission" becomes relevant upon examination by an immigration officer, which occurs *before* a § 1229a proceeding even commences. 8 U.S.C. § 1225(b)(2)(A) ("[I]f the examining immigration officer determines . . . the alien shall be detained for a proceeding . . . ").  So, on the face of the text, the proper order of operations follows: inspection of an applicant for admission first (at which time, if he is "seeking admission," he shall be detained), then referral to a

§ 1229a proceeding before an immigration judge. The Government has reversed the proper ordering contained in the statute, vitiating its temporal language.[17] Moreover, a § 1229a proceeding occurs before an "immigration judge"; it does not constitute an examination by an "immigration officer." 8 U.S.C. § 1229a(a)(1); *compare id.* § 1101(b)(4), *with id.* § 1101(a)(18).

Finally, we think the Government's argument falters because, as we've already observed, seeking relief from removal is not the same thing as seeking admission, and the notion that contesting one's removal under § 1229a constitutes "seeking admission" profoundly oversimplifies the manner in which removal may be contested. As the Supreme Court made clear in *Sanchez*, there are other ways in which an alien who enters unlawfully may shield himself from removal. *See* 593 U.S. at 415; 8 U.S.C. § 1229a(c)(4). While some aliens may be relegated to different proceedings, what becomes of those who are unadmitted and placed in § 1229a proceedings, but seek other lawful status? The Government's reading would say they are all "seeking admission," even though their lawful status, if granted, would not count as an admission. *See supra* Part III(A). The INA does not support this reading.

---

[17] The Petitioners also observe that the Government's argument would produce an anomalous result by making bond eligibility turn on whether or not an alien is seeking relief. So, an alien who fully abandons his claim to relief and agrees to self-deport may seek bond before self-deporting, but an alien who has a credible claim to asylum or another lawful status would be ineligible for bond.

## V.

Simply put, the language that Congress has chosen to use does not grant to the Executive unfettered authority to detain, without the possibility of bond, every unadmitted alien present in the country.  Nowhere in the text, structure, or history of the INA does that reading find steady footing.  We are obliged to read the words found in the statute -- "an alien who is an applicant for admission" and "an alien seeking admission" -- in line with the meaning Congress has given them.  When we do so, it appears to us that Congress has instead preserved the longstanding border-interior distinction for purposes of detention, a position it has taken for over a hundred years.

We therefore reject the Government's reading and affirm the district court's orders granting each of the Petitioners habeas corpus relief.

**AFFIRMED**.

25-14065                    Lagoa, J., Dissenting                    1

Lagoa, Circuit Judge, Dissenting:

The majority concedes that "applicant for admission" and "seeking admission," on their ordinary meaning, are "synonymous." Maj. Op. 15–16. It then spends fifty pages explaining why the ordinary meaning does not apply. The Fifth and Eighth Circuits disagree. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026). So do I.

I respectfully dissent.

## I.

Begin with what Congress wrote. *See Babb v. Wilkie*, 589 U.S. 399, 404 (2020). Section 1225(a)(1) "deem[s]" "[a]n alien present in the United States who has not been admitted" an "applicant for admission." 8 U.S.C. § 1225(a)(1).[1]

Section 1225(b)(2)(A) provides:

> Subject to subparagraphs (B) and (C), in the case of an alien *who is an applicant for admission*, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

---

[1] Although this appeal concerns consolidated cases with two petitioners, I use the singular "Petitioner" when referring to the Appellees.

2                          Lagoa, J., Dissenting                          25-14065

8 U.S.C. § 1225(b)(2)(A) (emphasis added).  It is undisputed that Petitioner is an "applicant for admission" under § 1225(a)(1).[2]  The majority holds that Petitioner is nevertheless not "seeking admission."  The statute says otherwise.

## A.

There is no daylight between an "applicant for admission" and an "alien seeking admission."  To "apply" means "[t]o request or *seek* employment, acceptance, or admission."  The American Heritage Dictionary of the English Language 63 (1980) (emphasis added).  As the Fifth Circuit put it, "[w]hen a person applies for something, they are necessarily seeking it."  *Buenrostro-Mendez*, 166 F.4th at 502 (citing Webster's New World College Dictionary 69, 1299 (4th ed. 1999)).  Common usage confirms as much.  No one would say, "she is an applicant for admission to the University of Miami, but she is not seeking admission to the University of Miami."

Petitioner resists that conclusion with an analogy of his own.  He asks us to imagine a statute defining "registered voter" as "anyone who is a U.S. citizen, over 18 years of age and who has completed their voter registration form," and then providing that "in

_____

[2] Petitioner Hernandez Alvarez, a Mexican citizen, entered the United States unlawfully in approximately November 2019 and has resided here continuously since that time.  Petitioner Cerro Perez, also a Mexican citizen, entered the country unlawfully in 2015 and has likewise maintained continuous residence.  Both came to the attention of immigration authorities following routine traffic stops, which resulted in their respective arrests by federal immigration officers.

25-14065                LAGOA, J., Dissenting                3

the case of an individual who is a registered voter, if an election inspector determines that an individual seeking to vote does not meet the eligibility requirements, the individual must submit to an inspection." A registered voter, he observes, need not be seeking to vote. The same, he concludes, must be true of an applicant for admission.

The analogy does not hold. Registering and voting are different acts directed at different objects, and the hypothetical statute keeps them distinct. One phrase describes a completed qualification, the other describes an election-day act. Section 1225 does no such thing. It pairs "applicant for admission" with "seeking admission"—the same act, the same object, on both sides of the pairing.

If Petitioner wished to make his analogy parallel, he should have hypothesized a statute using "applicant for voter registration" and "seeking to register to vote." One suspects the reason he did not is that, so constructed, the analogy would refute the very position it was designed to support. An applicant for voter registration is plainly seeking to register to vote. So too here. "Just as an applicant to a college seeks admission, an applicant for admission to the United States is 'seeking admission' to the same, regardless whether the person actively engages in further affirmative acts to gain admission." *Buenrostro-Mendez*, 166 F.4th at 502.

The majority nonetheless adopts the voter analogy. *See* Maj. Op. 23–24. But the analogy works only if "registered voter" and "applicant for admission" are doing the same work. They are not.

4                    Lagoa, J., Dissenting                    25-14065

"Registered voter" looks backward.  The Oxford English Dictionary (OED)—the majority's preferred source for this exercise—defines "registered" as "[o]f a person: entered on an official register as having particular qualifications." *Registered*, adj., Oxford English Dictionary (online ed.), [https://perma.cc/D5RV-C2DK]. A registered voter is someone who has completed the registration process and thereby holds the *right* to vote in upcoming elections.[3] Whether she now seeks to vote is a separate question.  A word describing something already done says nothing about what the person is doing now.

"Applicant for admission" is forward-looking by construction.  "Applicant" identifies the person doing the applying, and "for admission" identifies what the applicant is after.  The majority has itself said as much, acknowledging that "applicant for admission"

---

[3] Every court I could find to consider the term "registered voter" has understood it this way.  *See, e.g., State ex rel. Moore v. Malone*, 96 Ohio St. 3d 417, 421 (2002) ("'registered voters' . . . means those persons who were registered to vote . . . rather than those who actually voted"); *City of S. Salt Lake v. Salt Lake Cnty.*, 925 P.2d 954, 958–59 (Utah 1996) (rejecting the interpretation "that the term 'registered voters' means 'registered voters voting in the election'" for the "common and of clear meaning" of the term: "those registered"); *Chalmers v. Funk*, 76 Va. 717, 719–20 (1882) ("When these statutes speak of registered voters, they uniformly refer to the persons whose names are placed upon the registration books provided by law as the sole record or memorial of the duly qualified voters of the State. . . . It is believed that no statute can be found, general or special, in which the word 'registered' has been used in any other sense, or for any other purpose, than that now suggested.").

25-14065                 Lagoa, J., Dissenting                    5

and "seeking admission," on their ordinary meaning, are "synony-mous." Maj. Op. 15–16.

That concession, however, is difficult to square with the ma-jority's later description of "applicant for admission" as a "passive term of art." Maj. Op. 24. The majority cannot have it both ways. And the voter analogy does not bridge the gap, because whatever its other infirmities, a phrase that looks backward cannot tell us how a phrase that looks forward behaves.

The majority's choice of dictionary sense illustrates the dif-ficulty. The OED's first sense of "voter" is "[a] person who has a right to vote in an election," and one illustrative example the OED gives for that sense is "registered voter." *Voter*, Oxford English Dic-tionary (online ed.), [https://perma.cc/D5RV-C2DK]; *see Voter*, Black's Law Dictionary (12th ed.) (same).

The majority selects the OED's second sense—the one de-scribing a person in the act of voting—because it makes "voter" resemble "applicant." Maj. Op. 23–24. But the question here is not what "voter" means standing alone; it is what "registered voter" means. On that question, the dictionaries, caselaw, and ordinary usage all point the same way.

The analogy, in short, proves only that a completed-status phrase, concerning one object, can be separated from an action phrase concerning another. No one doubts that. Our question is whether an ongoing-status phrase—"applicant for admission"—can be similarly separated from "seeking admission." I agree with

the majority's first instinct, *see* Maj. Op. 15–16, that the ordinary meaning of these words means that it cannot.

Up to this point, the majority agrees. "If our task ended with the ordinary meaning of the two phrases," it writes, "we would agree that they are synonymous." Maj. Op. 15–16. If so, the government is correct, and Petitioner is subject to mandatory detention. The only question, then, is whether the majority can escape the ordinary meaning it has conceded. It cannot.

Its attempted escape route runs through the word "means." According to the majority, § 1225(a)(1) "*defines* ['applicant for admission'] to *mean* '[a]n alien present in the United States who has not been admitted or who arrives in the United States.'" Maj. Op. 16 (emphases added). From this recharacterization, the majority reasons that "applicant for admission" is a term of art whose plain-English meaning carries no independent force. *Id*.

That is not what Congress wrote. Section 1225(a)(1) does not "define" "applicant for admission" by listing its new meaning, set off by the word "means." *See Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979) ("As a rule, '[a] definition which declares what a term 'means' . . . excludes any meaning that is not stated.'") (quoting 2A C. Sands, Statutes and Statutory Construction § 47.07 (4th ed. Supp. 1978)); *see also Groman v. Commissioner*, 302 U.S. 82, 86 (1937) ("[W]hen an exclusive definition is intended the word 'means' is employed[.]"). Congress chose a different word. The majority substitutes "means" for it, and from that substitution concludes that "applicant for admission" is a "passive condition." Maj.

25-14065                    LAGOA, J., Dissenting                    7

Op. 16.  That conclusion does considerable work in the majority's analysis.  It should not, because it rests on the majority's word, not Congress's.[4]

The word Congress chose is "deemed."  Section 1225(a)(1) *deems* aliens "present in the United States who [have] not been admitted" to be applicants for admission.  8 U.S.C. § 1225(a)(1).  "The key word here is 'deemed.'  That term is used in legal materials '[t]o treat (something) as if . . . it were really something else.'" *Sturgeon v. Frost*, 587 U.S. 28, 47 (2019) (quoting Black's Law Dictionary 504 (10th ed. 2014)).  Here, Congress took a class of persons who typically have not "applied" for anything—because they chose to bypass a lawful port of entry—and required they be treated as "applicants."  *See* 8 U.S.C. § 1225(a)(1) (titling the section "Aliens treated as applicants for admission").  It is, without a doubt, a "legal fiction," but the question is whether that congressional declaration carries consequences, or whether it is a label and nothing more.

*Sturgeon* answers that question.  There, Congress drew national park boundaries in Alaska that encompassed privately owned land.  It then "deemed" those private lands not "to be included as a portion of" the parks in which they sat.  587 U.S. at 47 (citing 16 U.S.C. § 3103(c)); *see id.* ("The fiction in Section 103(c)

---

[4] Even if Congress had "defined" "applicant for admission" in the traditional sense (it did not), its ordinary meaning is not simply discarded.  Rather, "[w]hen choosing among interpretations of a statutory definition, the 'ordinary meaning' of the 'defined term' is an important contextual clue." *Delligatti v. United States*, 604 U.S. 423, 435 (2025) (citation omitted).

involves considering certain lands actually within the new national parks as instead without them."). Undeterred, the Park Service argued it could still regulate those private lands under statutes reaching property "within" such parks. *Id.* at 48 (quoting 54 U.S.C. § 100751). The Court unanimously rejected that argument. *Id.* at 54–55. "There is no reason to pretend," the Court explained, "that inholdings are not part of a park if they can still be regulated as parklands." *Id.* at 51. So too here: Congress has mandated that we must treat all aliens "present in the United States who [have] not been admitted" as if they are actually "applicants for admission." 8 U.S.C. § 1225(a)(1).

The majority is no stranger to *Sturgeon*. Its entire textual argument rests on it, invoking the principle that "[w]hen Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" Maj. Op. 14 (quoting *Dep't of Ag. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) (quoting *Sturgeon*, 587 U.S. at 56)). I agree with that principle. But I would also apply the rest of the opinion. The majority takes *Sturgeon*'s instruction on deference to statutory definitions but leaves behind its instruction about enforcing statutory deeming provisions. *Sturgeon* is not a buffet—the majority cannot take the rule it likes and leave the rest behind.

The majority presses further. Even acknowledging the fiction, it characterizes the deeming clause as displacing the ordinary meaning of "applicant for admission." Maj. Op. 16 n.2. On that reading, the phrase "mean[s]" an alien who is "arriving" or "present

25-14065                    LAGOA, J., Dissenting                    9

in" the country without admission.  Maj. Op. 16.  A "specialized meaning," says the majority, that "exclu[des] . . . all other aliens who might otherwise be considered applicants."  Maj. Op. 16 n.2. That understanding seemingly stems from what *Sturgeon* called a fiction operating "by negative implication."  587 U.S. at 47.  But the statute in *Sturgeon* deployed the word "only," a word that is inherently exclusionary.  *Id.* (quoting 16 U.S.C. § 3103(c)).  Section 1225(a)(1) contains nothing comparable.  It does not deploy "only," *see id.*, nor does it deploy "means," *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 226 (2012) ("When, by contrast [to 'including'], a definitional section says that a word 'means' something, the clear import is that this is its *only* meaning.").  Congress told us what unadmitted aliens, like Petitioner, are to be *treated as*.  It said nothing about what "applicants for admission" *means*.

And even on its most sympathetic reading, the deeming clause in *Sturgeon* did not displace the ordinary meaning of the deemed category.  The phrases "included as a portion of such [park]" and "within [the park]" are synonymous.  But they are not the same words.  Were the majority correct, "included as a portion of such [park]" would carry no ordinary meaning and thus would say nothing about whether the lands are "within" the park.  Just so here: "applicant for admission" and "seeking admission" are—like "included as a portion of" and "within," and as the majority agrees—synonymous.  A deeming clause does not replace the meaning of the category with the class Congress assigned to it.  It places the class into the category.

10                    LAGOA, J., Dissenting                    25-14065

The principle is straightforward.  When a statute deems "A" to be "B," it places A in the legal posture of B as a matter of law, with the consequences that follow.  Otherwise, "there [is no] need to create a special legal fiction" in the first place.  *Sturgeon*, 587 U.S. at 51.

The Court's immigration cases have applied this principle for over a century.

*Kaplan v. Tod*, 267 U.S. 228 (1925), is illustrative.  A thirteen-year-old Russian national arrived at Ellis Island in 1914 and was ordered excluded.  When World War I prevented deportation, she was released to a charitable society and lived with her father for nearly eight years.  Her father was naturalized during that period, and she claimed citizenship under a provision conferring it on minor children of naturalized parents "if dwelling in the United States."  *Id.* at 230.  Justice Holmes rejected the claim.  Her release from Ellis Island, he explained, did not change "the nature of her stay within the territory."  *Id.*  She remained "in theory of law at the boundary line and had gained no foothold in the United States."  *Id.*  Eight years of physical habitation was not "dwelling" because "until she legally landed[, she] 'could not have dwelt within the United States.'"  *Id.* (quoting *Zartarian v. Billings*, 204 U.S. 170, 175 (1907)).

*Leng May Ma v. Barber*, 357 U.S. 185 (1958), carried the principle forward.  There, a Chinese national arrived in the United States, was released on parole, and was ordered excluded.  She sought the benefit of a provision protecting "any alien within the

25-14065                    LAGOA, J., Dissenting                    11

United States" from deportation if certain criteria are met. *Id.* at 185–86 (citing the 1952 version of Section 243(h) of the Immigration and Nationality Act (INA)). Her argument was simple: she was physically present in the country, so she was "'within the United States,' and hence covered by [§] 243(h)." *Id.* at 187. The Court disagreed. Despite her undisputed physical presence in the country, the Court held she could not invoke the provision. *Id.* at 190. Instead, a preceding provision treating parolees as aliens stopped at the border carried through to a subsequent provision governing those "within the United States." That phrase, with all its ordinary-English force, applied to the legal reality Congress had created, not to the physical reality the alien inhabited. *Id.* at 188–90.

The same principle applies here, and what it demands is more modest. *Kaplan* required treating a person who had physically dwelt in the United States for eight years as *not* dwelling here. *Leng May Ma* required treating a person physically within the country as *not* within it.[5] Here, we need only treat a person whom Congress has deemed an "applicant for admission" as one who "seeks"

_____

[5] I reference *Kaplan* and *Leng May Ma* not for the specific statutory frameworks they applied—Congress substantially restructured those frameworks through IIRIRA—but for the principles they illustrate concerning the operation of legal fictions in immigration law. The majority invokes *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and its observation that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." Maj. Op. 46. But § 1225(a)(1) collapses that distinction—deeming both unlawfully present aliens and arriving

12                    LAGOA, J., Dissenting                    25-14065

it.[6]  That is not a stretch of the legal fiction because, as explained above, an "applicant" for admission is one who "seeks" it.

Nor is this a principle courts alone have recognized.  Section 1182(d)(5)(A) extends parole to "any alien *applying for admission*."  8 U.S.C. § 1182(d)(5)(A) (emphasis added).  Since 1998, the government has treated unlawfully present aliens as "applying for admission" under that provision by operation of § 1225(a)(1).  *See* Paul W. Virtue, General Counsel, INS, Authority To Parole Applicants For Admission Who Are Not Also Arriving Aliens, Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685, at *2 (concluding that aliens "who were once deportable for having entered without inspection are now considered in law to be applicants for admission" and thus "within the scope of the statutory parole authority"); *see also* Memorandum from Gus Coldebella, DHS General Counsel (Sept. 28,

---

aliens "applicant[s] for admission" and using that term to introduce the detention provision we are asked to interpret.

[6] Others have said the same before this litigation.  *See Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 194 n.2 (4th Cir. 2021) (equating the two concepts: because the alien "was never lawfully admitted, he qualifies as someone 'seeking admission'"); *Crane v. Napolitano*, 2013 WL 1744422, at *7 (N.D. Tex. Apr. 23, 2013) (rejecting limitation of § 1225(b)(2)(A) to arriving aliens because "Congress has not" used the readily available terms "arriving alien" or "alien arriving in the United States," and holding the provision "applies to 'applicants for admission' . . . whether they are arriving in the United States at a port of entry or are encountered by immigration officers elsewhere in the United States"); *Matter of Lemus-Losa*, 25 I&N Dec. 734, 743 (BIA 2012) ("[M]any people who are not *actually* requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws.").

25-14065                LAGOA, J., Dissenting                13

2007) (endorsing that conclusion).  Two of our sister circuits have concurred.  *See Cruz-Miguel v. Holder*, 650 F.3d 189, 197–98 (2d Cir. 2011); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116 (9th Cir. 2007).

In December 2019, Congress expressly referenced "parole in place under section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5))" for military family members who entered without inspection,[7] directed DHS to consider, on a case-by-case basis, whether such parole would constitute a "significant public benefit," and declared that "the importance of the parole in place authority of the Secretary of Homeland Security is reaffirmed." Pub. L. No. 116-92, § 1758, 133 Stat. 1860–61 (2019), codified at 8 U.S.C. § 1182 note.  The word "reaffirmed" presupposes the authority existed.

What follows from these interpretations is plain.  If the deeming provision makes an unlawfully present alien one who is "applying for admission" for purposes of parole, it makes him one

---

[7] *See, e.g.*, USCIS Policy Memorandum PM-602-0091, Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i) (Nov. 15, 2013) (explaining that parole, though ordinarily used to admit aliens from outside the country, may also be granted to aliens already present without admission—so-called "parole in place"—because § 1225(a)(1) treats any such alien as an "applicant for admission" subject to the Secretary's parole discretion under § 1182(d)(5)(A)).

14                    Lagoa, J., Dissenting                    25-14065

who is "seeking admission" for the purposes of detention. The statute does not say its legal fiction applies only when it benefits the alien.[8]

Where does that leave us? The ordinary meaning of the two phrases is synonymous—a point the majority concedes. The deeming clause, for its part, creates a legal fiction—a concept the majority describes as "run[ning] through the INA." Maj. Op. 23 n.6. What remains is whether that fiction carries through to the provision that uses the synonymous phrase. *Sturgeon*, *Kaplan*, *Leng May Ma*, and § 1182(d)(5)(A) each say it does. If a person whom Congress has deemed an applicant for admission is not seeking admission, it is hard to know what Congress thought it was deeming him to be.

In the end, my colleagues describe this interpretative exercise as "tee[ing] up a legal fiction of considerable importance in the INA." Maj. Op. 19. Quite right. We should not ignore it.

---

[8] Because the majority holds that an unlawfully present alien is not "seeking admission," it must follow that such an alien is not "applying for admission." "Applying," like "seeking," is an undefined present participle. By nullifying Congress's express deeming clause in § 1225(a)(1) for purposes of § 1225(b)(2)(A), the majority's reading calls into serious question whether unlawfully present aliens remain eligible for parole under § 1182(d)(5)(A)—a split from the Second and Ninth Circuits, a contradiction of 8 U.S.C. § 1182 note, and itself upending nearly three decades of agency practice.

25-14065                    LAGOA, J., Dissenting                    15

**B.**

The structure of § 1225 confirms what the text independently establishes. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

First, § 1225(a)(3) provides that "[a]ll aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The phrase "or otherwise" has a settled meaning. It "operates as a catchall: the specific items that precede it are meant to be subsumed by what comes after the 'or otherwise.'" *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 964 (11th Cir. 2016) (en banc) (citing *Begay v. United States*, 553 U.S. 137, 153 (2008) (Scalia, J., concurring in the judgment)); *accord Kleber v. CareFusion Corp.*, 914 F.3d 480, 483 (7th Cir. 2019) (en banc). "Applicants for admission" precedes "or otherwise." "Seeking admission" follows. Section 1225(a)(3) thus makes plain that applicants for admission are a subset of those seeking admission. An unremarkable premise.

The majority resists. It invokes what it calls "a second, equally accepted and quite distinct reading of 'or otherwise'"—one in which the phrase "refer[s] to something that is different from something already mentioned." Maj. Op. 30. The reading is neither equally accepted nor distinct. It is the very reading this Court

rejected en banc in *Villarreal*. As we explained, that approach "discusse[s] 'or' and 'otherwise' in isolation. Words can acquire different meanings when combined in a phrase, and the phrase 'or otherwise' is different from the sum of its parts." *Villarreal*, 839 F.3d at 964. The majority offers no reason to revisit that conclusion beyond the assertion that its interpretation is more appropriate "especially when 'otherwise' is followed by a series of terms." Maj. Op. 30 (relying on a sole reference to 38 U.S.C. § 8102(b)).

But the majority need not have looked beyond the four corners of IIRIRA. Congress used "or otherwise" followed by a series of terms elsewhere in the same act. The construction confirms *Villarreal*. One provision reaches anyone who "murders or otherwise causes death, bodily injury, or serious bodily injury to an individual." Pub. L. No. 104-208, Div. C, Title II, § 203(e), Sept. 30, 1996, 110 Stat. 3009-566. Another authorizes States to "prohibit or otherwise limit or restrict" alien eligibility for public assistance programs. 8 U.S.C. § 1624.

In both, the specific precedes "or otherwise" and a broader disjunctive series follows. In both, subsumption is the only plausible reading. Murder is a way of causing death. Prohibiting is a way of limiting. "The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) (internal quotation marks omitted). The

25-14065                    LAGOA, J., Dissenting                    17

majority's reading of "or otherwise" finds no support in the statutory text. And it directly contravenes this Court's decision in *Villarreal*.

The majority's attempts to distinguish *Villarreal* are no more persuasive. It first argues that applying the case here would "introduce a real tension into the statute." Maj. Op. 34. The tension the majority perceives, however, exists only if its reading of § 1225(b)(2)(A) is already correct. That is the very question *Villarreal* helps answer. It is not a basis for distinguishing a case. It is a reason for applying it. The majority next contends that *Villarreal* is inapposite because there the disputed language was "the central text at the heart of the parties' dispute," whereas § 1225(a)(3) is merely contextual. Maj. Op. 34. Yet the majority itself described the government's reliance on § 1225(a)(3) as "perhaps its strongest textual argument." Maj. Op. 29. Apparently, the provision is strong enough to demand several pages of rebuttal but not important enough to warrant application of the en banc precedent that governs it. In any event, the meaning of "or otherwise" does not change depending on whether the provision in which it appears is "central" or peripheral.

The majority then retreats to grammar. *Villarreal*, it says, applies only where "or otherwise" connects verbs, and § 1225(a)(3) pairs a noun phrase ("applicants for admission") with a participial phrase ("seeking admission"). Maj. Op. 34–35. The distinction has no basis in law and little (if any) basis in practice. Elsewhere in the

18                    LAGOA, J., Dissenting                    25-14065

federal code, Congress uses "or otherwise" to subsume noun phrases into participial catchalls.

The National Security Act, for example, caps the number of professional staff of the National Security Council, "including persons employed by, assigned to, detailed to, under contract to serve on, or otherwise serving or affiliated with the staff[,]" at 200.  50 U.S.C. § 3021(e)(3).  "Persons … under contract to serve on," like "applicants for admission," is a noun phrase.  "Serving," like "seeking," is participial.  Being under contract to serve on a staff is one way of serving it—just as being an applicant for admission is one way of seeking it.  No one reads "or otherwise" in § 3021 to mean that persons under contract to serve on the staff are doing something *different* from "serving" it simply because the grammar is mixed.[9]

The majority's reliance (at 31) on *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123 (2019), is misplaced.  *Helsinn*

---

[9] The majority's football analogy suffers the same defect as its voter analogy. *See* Maj. Op. 35.  It works only by substituting a different object for the one Congress chose.  That is moving the goal posts.  Had the majority correctly used "applicants for football tryouts" rather than "football players," the analogy would refute the majority's position.  And on the majority's own definition of "seeking," *see id*. at 17, football players have plainly taken an "affirmative step" toward playing football—they are football players.  That the analogy quietly adds "at the end of the football season" illustrates the problem with analogies in the first place: they can be structured to reach any result.  We need not resort to inapposite hypotheticals when Congress has provided real examples.

25-14065                LAGOA, J., Dissenting                19

asked whether the catchall phrase "otherwise available to the public" limits the specific terms that precede it—whether it narrowed "on sale" to only public sales. The Supreme Court said no. But it said no because "on sale" had acquired a settled meaning over two centuries of precedent, which included "secret sales," and the addition of the catchall was "simply not enough of a change for [the Court] to conclude that Congress intended to alter the meaning of the reenacted term." *Helsinn*, 586 U.S. at 131. That is a holding about reenactment, not about the function of "or otherwise." *Helsinn* resolved the former, not the latter. And the reenactment presumption on which it turned has no purchase here. Congress coined "applicants for admission" in the same enactment in which it wrote "or otherwise seeking admission." There is no settled meaning to preserve.

The majority nonetheless seizes on *Helsinn*'s observation that the catchall "otherwise available to the public" "captures material that does not fit neatly into the statute's enumerated categories but is nevertheless meant to be covered." *Id.* at 132. But even transplanting that observation into § 1225(a)(3), far from the reenactment context that produced it, the result is entirely compatible with subsumption. A catchall, by definition, sweeps more broadly than the specific terms it accompanies. For example, "causes death" sweeps more broadly than "murders." *See* Pub. L. No. 104-208, Div. C, Title II, § 203(e), Sept. 30, 1996, 110 Stat. 3009-566. The broader term captures additional material; the specific remains subsumed within it. Nothing in *Helsinn* disturbs what this Court held in *Villarreal*.

20                    LAGOA, J., Dissenting                    25-14065

The statute itself proves the point. Stowaways are not "applicants for admission." 8 U.S.C. § 1225(a)(2). Yet they must be inspected and "shall be ordered removed *upon inspection*." 8 U.S.C. § 1225(a)(2) (emphasis added); *id*. § 1225(a)(3). And stowaways can apply for asylum. *See* 8 U.S.C. § 1225(a)(2). Stowaways thus do not "fit neatly into the statute's enumerated categor[y]" of "applicants for admission" but are "nevertheless meant to be covered." *Helsinn*, 586 U.S. at 132. Section 1225(a)(3) covers them—not by treating "seeking admission" as something *different* from applying for it, but by treating it as something *broader*. A stowaway is not an applicant for admission; a stowaway is, however, someone otherwise seeking admission. 8 U.S.C. § 1225(a)(2) ("An arriving alien who is a stowaway . . . "); *cf*. Maj. Op. 36 ("§ 1225 applies to arriving aliens seeking entry at the border"). The catchall sweeps in what the specific term does not, precisely because the specific is a subset of the general. That is not in tension with *Helsinn* but an illustration of it.

The word "all" leaves little room for doubt. "All aliens . . . who are applicants for admission or otherwise seeking admission . . . shall be inspected." 8 U.S.C. § 1225(a)(3). If "or otherwise" selected only a subset of applicants for admission—arriving aliens as the majority suggests, *see* Maj. Op. 36—the provision would not require inspection of *all* such aliens. It would require inspection of some. "All means all." *City of Jacksonville v. Jacksonville Hosp. Holdings, L.P.*, 82 F.4th 1031, 1038 (11th Cir. 2023).

Second, § 1225(a)(5) provides "[a]n applicant for admission may be required to state under oath any information sought by an

25-14065                    Lagoa, J., Dissenting                    21

immigration officer regarding the purposes and intentions of the applicant *in seeking admission* to the United States." (emphasis added). The subject of that sentence is "an applicant for admission." The gerund phrase "in seeking admission" describes what that subject is doing. Congress did not treat "seeking admission" as a separate condition the applicant may or may not satisfy. *See Avila*, 170 F.4th at 1134. It presupposed the connection. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 537 (2015). One cannot have purposes and intentions in seeking admission without seeking admission. *See Chen v. Almodovar*, 2026 WL 100761, at *9 (S.D.N.Y. Jan. 14, 2026) (Cronan, J.).

The majority waves this away, observing that the listed inquiries—intended length of stay, intent to remain permanently or become a citizen, inadmissibility—are "only relevant to those who have not yet entered the country." Maj. Op. 28. That is not quite right. An immigration officer can ask an unlawfully present alien each of those questions, and the alien can answer them. How long do you intend to stay? Do you intend to remain permanently or become a United States citizen? Are you inadmissible? These questions are perfectly intelligible, and the answers perfectly informative.

In any event, § 1225(a)(5) draws no distinctions. Its subject is "an applicant for admission." Not "an arriving alien." Not "an applicant for admission who happens also to be seeking admission." There is no dispute that unlawfully present aliens are applicants for admission pursuant to the deeming provision. That

makes them the subject of § 1225(a)(5).  The majority's argument amounts to the claim that the provision fits arriving aliens better.  Maybe so.  But a more comfortable fit does not allow us to read an exception into § 1225—particularly when Congress provided none.

The foregoing provisions confirm what "seeking admission" means.  Section 1225(b)(2)(C) forecloses what the majority says it means.

The majority, like the Petitioner, defines "seeking admission" as "pursuing 'lawful entry . . . into the United States after inspection and authorization by an immigration officer.'"  Maj. Op. 18.  Section 1225(b)(2)(C) provides:

> In the case of an alien described in subparagraph (A) who is arriving on land *(whether or not at a designated port of arrival)* from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(C) (emphasis added).  The phrase "an alien described in subparagraph (A)" incorporates the full text of § 1225(b)(2)(A), including its "alien seeking admission" language.

Now consider the parenthetical: "whether or not at a designated port of arrival."  8 U.S.C. § 1225(b)(2)(C).  An alien arriving *between* designated ports of entry is not presenting for inspection.  He is not pursuing "lawful entry … into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A) (defining the term "admission"); *see id.* § 1325(a)

25-14065                    LAGOA, J., Dissenting                    23

(criminalizing entry "at any time or place other than as *designated* by immigration officers") (emphasis added).  He is avoiding it.  Yet Congress expressly treated him as "an alien described in subparagraph (A)," 8 U.S.C. § 1225(b)(2)(C), or, as the majority puts it, "that is to say, [an alien] 'seeking admission.'"  Maj. Op. 39.

If "seeking admission" meant what the majority says it means—affirmative, present-tense conduct directed at obtaining lawful entry through inspection—an alien arriving between ports of entry could not satisfy it.  The parenthetical would describe nobody.  Congress does not write provisions that "have no operation at all."  *Marbury v. Madison,* 1 Cranch 137, 174 (1803).

What § 1225(b)(2)(C) reveals is that "seeking admission" cannot bear the meaning the majority assigns it.  And once that construction falls, the majority's basis for excluding unlawfully present aliens from § 1225(b)(2)(A) falls with it.  "Seeking admission" is not a description of what the alien is subjectively doing or intending.  It is a consequence of what Congress has deemed him to be.

## C.

Petitioner's strongest response is surplusage.  If all "applicants for admission" are necessarily "seeking admission," he explains, the latter phrase is effectively written out of § 1225(b)(2)(A), "rendering it superfluous."  The argument proves less than it seems.

What we have is a doublet—"two ways of saying the same thing that reinforce its meaning."  *Doe v. Boland*, 698 F.3d 877, 881 (6th Cir. 2012) (Sutton, J.) (citing *Freeman v. Quicken Loans, Inc.*, 566

24                    LAGOA, J., Dissenting                    25-14065

U.S. 624, 635 (2012)).  In *Boland*, the statute allowed "[a]ny person who, while a minor, was a victim" of certain crimes "and who suffers personal injury as a result" to recover damages.  *Id.* at 880 (quoting 18 U.S.C. § 2255).  The defendant argued that "victim" and "person who suffers personal injury" must denote different categories.  The court disagreed.  "A victim by definition is someone who suffers an injury."  *Id.* at 882.  The statute did "not create one category of victims and another category of people who suffer personal injuries."  *Id.* at 881.  The two phrases were a doublet: different words, same concept.

So too here.  An applicant by definition is one who seeks.  Section 1225(b)(2)(A) does not create one category of applicants for admission and another category of aliens seeking admission.  It describes the same alien twice: once using the operative term in the introductory clause and once using ordinary English in the operative clause.  That is a doublet, not surplusage.  *Id.* ("the presumption against surplusage does not apply to doublets").[10]

---

[10] The majority declares "[Section 1225(b)(2)(A)] outlines two conditions with differing grammatical frameworks, so that each must be independently met."  Maj. Op. 24–25.  The Eighth Circuit already explained why this interpretation is misplaced.  "Generally, when a statute lists a phrase as a distinct condition for the occurrence of another event, it will use clauses with words like 'if' and 'and' to show that it is required."  *Avila*, 170 F.4th at 1134 (citation omitted).  The majority's "reading is highly unnatural because there is no word like 'and' to signify that there are multiple conditions in the clause; the only relevant inquiry is whether an alien 'is [or is] not clearly . . . entitled to be admitted.'"  *Id.* (quoting 8 U.S.C. § 1225(b)(2)(A)).

25-14065                LAGOA, J., Dissenting                25

True, different phrases in the same statute presumptively carry different meanings. *See Bailey v. United States*, 516 U.S. 137, 145–46 (1995). But that presumption has limits. It is a canon of interpretation, not an "absolute rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). "[R]edundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of fore-sight, or sometimes simply because of the shortcomings of human communication." *Barton v. Barr*, 590 U.S. 222, 239 (2020).

Section 1225(b)(2)(A)'s exceptions illustrate that this partic-ular statute was drafted with redundancy from the start. Section 1225(a)(2) provides that "[i]n no case may a stowaway be consid-ered an applicant for admission." 8 U.S.C. § 1225(a)(2). Because § 1225(b)(2)(A) applies only to "an alien who is an applicant for ad-mission," a stowaway could never fall within it as a matter of law. Congress exempted them anyway. *See* 8 U.S.C. § 1225(b)(2)(B)(iii). That is surplusage. And Congress put it there on purpose.[11] With "respect to this Act, rigorous application of the canon [against sur-plusage] does not seem a particularly useful guide to a fair construc-tion of the statute." *See King v. Burwell*, 576 U.S. 473, 491 (2015).

---

[11] Congress explicitly exempted from § 1225(b)(2)(A) a class of aliens that could *never* fall within it in the first place. The majority, meanwhile, reads Congress as having implicitly excluded an entire category of unadmitted aliens through the phrase "seeking admission"—a phrase synonymous to the one Congress chose in § 1225(a)(1) to bring those aliens into the statute. If Congress was willing to be explicit about stowaways, one would expect it to be at least as explicit about the far more consequential exclusion the majority finds.

26                    LAGOA, J., Dissenting                    25-14065

The majority's reading, moreover, creates a far worse surplusage problem than the one it purports to solve. *See Marx*, 568 U.S. at 385 ("[T]he canon against surplusage assists only where a competing interpretation gives effect to every clause and word of a statute.") (internal quotation marks omitted). Under the majority's construction, § 1225(a)(1)'s first prong—aliens "present in the United States who ha[ve] not been admitted"—does no work anywhere in § 1225. Congress created a broad class, applied it to the entire "chapter," *see* 8 U.S.C. § 1225(a)(1), and then, on the majority's account, excluded half of that class from every operative consequence in the section where the phrase appears. Section 1225(b)(2)(C) suffers a similar fate. *See supra* Part I(B). The majority says that: "§ 1225 seems to us to have been designed by Congress to govern arriving aliens." Maj. Op. 39. If that is true, one must ask why Congress bothered to enact § 1225(a)(1) at all.

The majority cannot wield the surplusage canon to "eviscerate another portion of the statute contrary to its text." *Barton*, 590 U.S. at 239. Doublet redundancy in a single sentence is a minor interpretive cost. Nullifying the reach of a deeming provision across an entire statutory section is not. "[I]t is well to remember the difference between giving a term a meaning that duplicates another part of the law, and giving a term no meaning at all." *Burwell*, 576 U.S. at 502 (Scalia, J., dissenting). I decline to render § 1225(a)(1) an inkblot. *See Sturgeon*, 587 U.S. at 51.

The Petitioner's surplusage argument concerning § 1226 and the Laken Riley Act fares no better. The argument assumes

that if § 1225(b)(2)(A) reaches interior unadmitted aliens, § 1226 has nothing left to do.  That assumption is wrong.

Section 1226(a) reaches a substantial population that § 1225(b)(2)(A) does not.  It is the sole detention authority for aliens who have been admitted to the United States—visa overstays, aliens deportable on different grounds, or aliens who procured admission through fraud.  *See Buenrostro-Mendez*, 166 F.4th at 505; *Avila*, 170 F.4th at 1137.

Section 1226(c) likewise does work § 1225(b)(2)(A) cannot. It sweeps in deportable aliens alongside inadmissible ones.  *See Buenrostro-Mendez*, 166 F.4th at 505 (citing 8 U.S.C. § 1226(c)(1)(B)–(C)).  And critically, it imposes a more restrictive release regime. Aliens detained under § 1225(b)(2)(A), including those unlawfully present in the country, are eligible for parole under § 1182(d)(5)(A). *See supra* Part I(A).  Aliens detained under § 1226(c) are not.  8 U.S.C. § 1226(c)(4).  The Laken Riley Act closed this gap—ensuring that criminal aliens subject to § 1226(c) could not be paroled after detention, a restriction § 1225(b)(2)(A) standing alone does not impose.

Congress passed the Laken Riley Act while the Executive was still declining to exercise its authority under § 1225(b)(2)(A), *see Buenrostro-Mendez*, 166 F.4th at 505, even as it interpreted § 1182(d)(5)(A) to permit parole of those same aliens.  It is unsurprising that, in the wake of the events that gave the Act its name, Congress wanted to foreclose "parole to aliens who have committed certain offenses."  *Avila*, 170 F.4th at 1137.

28                    Lagoa, J., Dissenting                    25-14065

The majority adopts Petitioner's appeal to § 1226, explaining that the "Government's interpretation cannot readily be reconciled with" *Jennings v. Rodriguez*, 583 U.S. 281 (2018). Maj. Op. 42–43.

*Jennings* addressed whether prolonged detention under §§ 1225(b) and 1226(c) required periodic bond hearings. 583 U.S. at 286. It did not address whether § 1225(b)(2)(A) reaches unlawfully present aliens in the interior. The Court's general description of the statutory framework was background, not holding. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) ("[T]he language of an opinion is not always to be parsed as though we were dealing with language of a statute.") (internal quotation marks omitted).

Still, the majority describes the Court's discussion in *Jennings* as "not a passing, off-hand remark" but "an expansive and detailed account of how the statute is best read." Maj. Op. 42. *Jennings*'s description of the statutory framework, however, is not the panacea the majority suggests.

The Court treated "seeking entry" and "applicants for admission" as interchangeable. *Jennings*, 583 U.S. at 297 (describing § 1225(b) as applying "primarily to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)"). Those applicants, *Jennings* recognized, "fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." *Id.* at 287. Section 1225(b)(2), for its part, was described as a "catchall provision that applies to *all* applicants for admission not covered by § 1225(b)(1)." *Id.* (emphasis added). As for

25-14065                 LAGOA, J., Dissenting                 29

who qualifies as an applicant for admission, "an alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is *treated as* 'an applicant for admission.'"  *Id.* (quoting 8 U.S.C. § 1225(a)(1)) (emphasis added).  The Court did not "define" "applicant for admission" to "mean" anything.  Like "deemed," it used the phrase "treated as."  "Applicants for admission," the Court continued, "must 'be inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law."  *Id.* (quoting 8 U.S.C. § 1225(a)(3)).  It did not limit § 1225(a)(3) to arriving aliens at the border.

If the majority wishes to accord *Jennings*'s dicta special weight, it must take all of it, not just the portions it favors.  *Jennings* does not foreclose the question we decide today because it simply does not address it.  *See Buenrostro-Mendez*, 166 F.4th at 505–06; *Avila*, 170 F.4th at 1137.

**D.**

Section 1225's history shows that Congress eliminated any geographical limitation its predecessor contained.  *See Bourdon v. United States Dep't of Homeland Sec. (DHS)*, 940 F.3d 537, 544 (11th Cir. 2019) ("When analyzing statutory history, we presume that 'a change in the language' of a statute, whether by reenactment or amendment, 'connotes a change in meaning.'") (quoting Scalia & Garner, *supra*, at 256).

The majority observes that since 1893, Congress has employed some version of the language now before us—"'arriving al-

ien immigrants,' aliens 'at the port of arrival,' 'alien[s] seeking en-try'"—and that each version applied to the border.  Maj. Op. 46–48.  The majority recounts this history faithfully.  It draws exactly the wrong lesson from it.

For over a century, Congress used language that unambiguously described arriving aliens.  No deeming clause.  No introductory "applicant for admission" clause.  No provision bringing unlawfully present aliens into the framework.  If Congress intended IIRIRA to continue that regime, the majority makes clear that it had a century of settled drafting to draw from.

IIRIRA departed from every one of those prior constructions.  It replaced "seeking entry" with "seeking admission."  For the first time in the statute's history, it grouped unlawfully present aliens alongside arriving aliens—including those arriving *away* from a lawful port of entry.  And it enacted a provision deeming them all "applicants for admission."  Then, in § 1225(b)(2)(A) itself, it introduced the detention mandate with the very term § 1225(a)(1) had just created: "an alien who is an applicant for admission."  8 U.S.C. § 1225(b)(2)(A).  "[W]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."  *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) (citation omitted).  On the majority's reading, none of this changed a thing.  In other words, the majority "act[s] as though the amendment . . . had not taken place."  *Ross v. Blake*, 578 U.S. 632, 642 (2016).  But it did.

What is more, Congress demonstrated throughout § 1225 that it knew how to limit a provision to arriving aliens when it wished to do so. *See*, *e.g.*, 8 U.S.C. § 1225(a)(2) ("[a]n arriving alien who is a stowaway"); *id.* § (b)(1) ("an alien . . . who is arriving in the United States"); *id.* § (b)(2)(C) (limiting its application from (b)(2)(A) to only an alien "who is arriving on land . . ."); *id.* § (c)(1) ("arriving alien"); *id.* § (d)(2) (same). Congress chose none of these formulations for § 1225(b)(2)(A). "Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

The majority then turns to legislative history. The endeavor, as Justice Scalia explained, is nothing more than "entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment). This case proves the point. The government and Petitioner offer directly contradictory excerpts from the legislative record. So do the majority here and the majorities of the Fifth and Eighth Circuits. *Compare* Maj. Op. 48–52, *with Buenrostro-Mendez*, 166 F.4th at 508, *and Avila*, 170 F.4th at 1135–36.

A majority of the Supreme Court recently made clear the role of legislative history in statutory interpretation: none. *See Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 645 (2026) (plurality opinion); *id.* at 659 n.2 (Gorsuch, J., concurring); *id.* at 697 n.11 (Kavanaugh, J., dissenting). "The greatest defect of legislative history

is its illegitimacy.  We are governed by laws, not by the intentions of legislators."  *Conroy*, 507 U.S. at 519 (Scalia, J., concurring in the judgment).

The majority concedes the ordinary meaning.  It cannot escape it through analogy, redefinition, or history.  At some point, the statute simply means what it says.  This is that point.

## II.

This issue requires no further analysis.  Text, structure, and statutory history each confirm what ordinary meaning independently establishes: unlawfully present aliens are, as applicants for admission, subject to mandatory detention under § 1225(b)(2)(A).  I write further, however, to address what the majority calls "the added virtue of statutory modesty."  Maj. Op. 32.

Here, the majority takes the skepticism and clear-statement requirements of the major questions doctrine and applies them not to § 1225(b)(2)(A)—the provision that mandates detention—but to § 1225(a)(3), a neighboring provision that confirms its meaning.  That approach has several problems.

First, it misidentifies the issue.  The government does not claim that § 1225(a)(3) is the source of detention authority.  That authority is § 1225(b)(2)(A), introduced by the deeming provision's term "applicant for admission."  Section 1225(a)(3) is structural confirmation—one of several provisions demonstrating that Congress understood "applicants for admission" to be "seeking admis-

25-14065                    Lagoa, J., Dissenting                    33

sion." The government's reading does not rest on oblique language in an ancillary provision. It rests on the operative term in the operative provision.

Second, the majority's reluctance to invoke the major questions doctrine by name is telling. And for good reason. The doctrine does not apply here. Yet by demanding clear-statement authorization not from the detention provision itself, but from a neighboring provision that illuminates its meaning, the majority creates a rule with no limiting principle. If § 1225(a)(3) must independently satisfy a clear-statement threshold before it may inform the meaning of § 1225(b)(2)(A), then every structural or contextual provision in the United States Code is subject to the same demand. "Statutory construction, however, is a holistic endeavor." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). The majority's approach subjects holistic interpretation to a burden it was never meant to bear.

Whether the majority calls its approach a "change" in "the nature of [its] review," or faults the government's reading for "falling well short of *clear congressional authorization*," *see* Maj. Op. 32–33 (emphasis added), the result is "a thumb on the scale against the President." *Learning Resources*, 146 S. Ct. at 691 (Kavanaugh, J., dissenting).[12]

---

[12] Although the majority disclaims reliance on the major questions doctrine, there is no other way to characterize its conclusion that the government's interpretation "fall[s] well short of clear congressional authorization." Maj. Op. 33. That formulation holds the government to a standard of textual clarity

34                    Lagoa, J., Dissenting                    25-14065

Regardless, Section 1225(b)(2)(A) does not present the kind of gap between statutory text and claimed executive power that the major questions doctrine polices.  It issues a mandatory detention command regarding a class Congress explicitly created.  *See Jennings*, 583 U.S. at 302 ("[Sections] 1225(b)(1) and (b)(2) mandate detention of aliens throughout the completion of applicable proceedings[.]").  The constitutional structure of immigration—overlapping power between the political branches—further counsels against the doctrine's application.  And even if the doctrine applied, § 1225(b)(2)(A) provides the "clear congressional authorization" it demands.

---

that ordinary statutory interpretation does not demand—one far closer to the "clear statement" rule some members of the Court have endorsed, *see Learning Resources*, 146 S. Ct. at 660 (Gorsuch, J., concurring) ("Our cases hold a clear statement is required to support a claim to an extraordinary delegated power."), rather than the "interpretive tool" others have described, *see Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring).  Regardless of which understanding is correct, the Second Circuit recently recognized the approach for what it is.  *See Cunha v. Freden*, 2026 WL 1146044, at *21 (2d Cir. Apr. 28, 2026) ("[I]n extraordinary cases[,] there may be reason to hesitate before accepting a reading of a statute that would, under more ordinary circumstances, be upheld.") (quoting *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022); *see also Buenrostro-Mendez*, 166 F.4th at 515 (Douglas, J., dissenting).  Indeed, the majority's analysis deploys nearly every indicator the Supreme Court has identified when applying the doctrine, stopping short, perhaps, only at expertise.  *Cf. West Virginia*, 597 U.S. at 746 (Gorsuch, J., concurring); *Learning Resources*, 146 S. Ct. at 707–09 (Kavanaugh, J., dissenting).  The majority may disclaim the label.  It cannot disclaim the result.

25-14065                    LAGOA, J., Dissenting                    35

## A.

The major questions doctrine addresses a recurring problem. In various cases, agencies have claimed sweeping powers from statutes that nowhere mention them. As a result, when "broad," "general," or "ambiguous" language is asked to bear the weight of a transformative regulatory program, courts demand that the agency "point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Util. Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). The concern is over major delegations "lurking" in uncertain text. *West Virginia*, 597 U.S. at 723. That demand makes sense where the statute and the claimed power are mismatched in scale. It makes no sense where they are not.

The cases in which the Court has applied the doctrine follow a common pattern. In *West Virginia*, the operative provision authorized the EPA to determine the "best system of emission reduction" for existing power plants. *Id.* at 718–19. From those five words, which specified no mechanism and identified no target, the EPA derived the authority to implement a generational shift in energy production from coal to natural gas and renewables. *Id.* at 713–14, 724. In *Biden v. Nebraska*, the phrase "waive or modify" became the vehicle for a $430 billion loan forgiveness program affecting forty-three million borrowers. 600 U.S. 477, 496–502 (2023). The Court described the result as "effectively the introduction of a whole new regime." *Id.* at 500–01 (quoting *MCI Telecomms. Corp. v. American Telephone & Tel. Co.*, 512 U.S. 218, 234 (1994)). And in *NFIB v. OSHA*, general authority to "set *workplace* safety standards"

was invoked to mandate vaccination for eighty-four million Americans. 595 U.S. 109, 117 (2022) (per curiam) (emphasis in original). As Justice Kavanaugh explained, "[a] major questions issue arises when . . . the generally worded statute does not *explicitly* mention the specific major power." *Learning Resources*, 146 S. Ct. at 707 (Kavanaugh, J., dissenting).

The doctrine does not even get off the ground here. Every case in which this Court has applied the major questions doctrine, the statutory language opened a field of discretion, and the question was whether the Executive's exercise of that discretion reached too far and claimed for itself a policy judgment that belonged to Congress. *See Util. Air*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency *decisions* of vast . . . significance.") (emphasis added).

Section 1225(b)(2)(A) opens no field of discretion. It does not invite the Executive to choose an undefined system. It does not authorize the Executive to waive or modify anything. It does not leave the Executive to decide what standards are appropriate. Instead, it commands a specific result for a specific class under a specific standard. And Congress created the class itself, in § 1225(a)(1), to include aliens present in the United States who have not been admitted. The Executive did not select that from a menu of options it came up with. Congress wrote it into the statute.

The question, then, is not whether the Executive chose wisely. The question is whether Congress meant what it said in the immediately preceding subsection. That question has a right

25-14065                LAGOA, J., Dissenting                37

answer and a wrong answer. It does not have a range of permissible answers from which the Executive selected that the majority finds too consequential. It is a consequence the statute mandates. *See Jennings*, 583 U.S. at 302.

The major questions doctrine polices the distance between open-ended statutory language and the Executive's chosen destination. Where the statute is not open-ended and the Executive has chosen nothing, there is no distance to police. *See Nebraska*, 600 U.S. at 516 (Barrett, J., concurring) ("In some cases, the court's initial skepticism might be overcome by text directly authorizing the agency action or context demonstrating that the agency's interpretation is convincing."). The majority should not use the doctrine's skepticism to create one, even implicitly. As Justice Barrett has cautioned, the doctrine should never cause a court to "forgo the most natural reading of a statute." *Learning Resources*, 146 S. Ct. at 672 (Barrett, J., concurring). As demonstrated above, the government's reading is the most natural one. Even if that were not enough, the application of the doctrine faces an additional obstacle.

## B.

The major questions doctrine applies to "extraordinary delegations of Congress's powers." *Learning Resources*, 146 S. Ct. at 638. It "works in much the same way to protect the Constitution's separation of powers." *West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring). But what are we to do when the Executive acts in a domain where both political branches possess constitutional authority? What we always do. Read the statute.

It makes little sense to apply the doctrine's skepticism to a statute in which Congress has spoken in a domain where both branches possess constitutional authority.  The separation of powers is not vindicated by applying the doctrine here to prevent the political branches from working together.

*i.*

The Court's discussion of "foreign affairs" in *Learning Resources* points the way.

In his concurrence, Justice Gorsuch explained that the major questions doctrine, like the nondelegation doctrine from which it derives, "does not apply where the President is exercising only his own inherent Article II powers" and "may speak with less force where the President and Congress enjoy 'overlapping authority.'" *Learning Resources*, 146 S. Ct. at 663 (quoting *Gundy v. United States*, 588 U.S. 128, 159 (2019) (Gorsuch, J., dissenting)).  When such power exists, the constitutional concern animating the doctrine— that agencies claim legislative authority Congress did not confer— is diminished or absent, because the Executive brings its own constitutional authority to the table.  *See Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting).

The plurality opinion in *Learning Resources* drew the same line.  It acknowledged that "the President of course enjoys some 'independent constitutional powers' over foreign affairs 'even without congressional authorization[,]'" and that "Congress certainly may intend to 'give the President substantial authority and flexibility' in many foreign affairs or national security contexts."

25-14065                    LAGOA, J., Dissenting                    39

*Learning Resources*, 146 S. Ct. at 642 (quoting *FCC v. Consumers'
Rsch.*, 606 U.S. 656, 707 (2025) (Kavanaugh, J., concurring)).  It re-
jected the foreign affairs exception for certain tariffs not because it
rejected the overlapping-powers principle, but because it con-
cluded that no overlap existed in the case before it.  *Id.*

     Justice Kavanaugh, dissenting in *Learning Resources*, took the
stronger position that the major questions doctrine should not be
"employ[ed] . . . as a thumb on the scale against the President" in
foreign affairs and national security contexts.  146 S. Ct. at 706–07,
720 n.24 (Kavanaugh, J., dissenting) (observing that "the question
of whether or how the major questions doctrine applies in foreign
affairs cases remains at least an open question," because "six Jus-
tices would not apply it in the foreign affairs context") (citing *Marks
v. United States*, 430 U.S. 188, 193 (1977)).  Although that critique
could certainly apply here, Justice Gorsuch's overlapping-powers
framework is sufficient to resolve this case.

     *Learning Resources* asks: is the Executive acting in a domain
where both political branches possess overlapping constitutional
authority?  If "no," the major questions doctrine may apply in full
force.  But if "yes," the doctrine holds less force—perhaps none at
all.  The Supreme Court concluded that there was no overlap for
peacetime tariffs.  For immigration, as I explain next, overlap is all
there is.

*ii.*

     Immigrant removal is a model of overlapping constitutional
authority.  It is what this Court held, en banc, in *Jean v. Nelson*, 727

40                     LAGOA, J., Dissenting                    25-14065

F.2d 957 (11th Cir. 1984).  It is what the Supreme Court has recognized for—at a minimum—seventy-five years.  And it is what was understood at the founding before that.  *See* C. Bradley & J. Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743, 1799 (2024) ("Immigration clearly concerns foreign affairs.  And more significantly, there is a long tradition, stretching back to the 1790s, of Congress granting the President broad discretion to expel non-U.S. citizens.").

In *United States ex rel. Knauff v. Shaughnessy*, the Court confronted a nondelegation challenge to a statute authorizing the Attorney General to exclude aliens without a hearing based on confidential information.  338 U.S. 537, 540–41 (1950).  The Court's holding could not be more clear:

> The exclusion of aliens is a fundamental act of sovereignty.  The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. . . .  When Congress prescribes *a procedure concerning the admissibility of aliens*, it is not dealing alone with a legislative power.  It is implementing an inherent *executive* power.

*Id.* at 542 (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936); *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893)) (emphases added).  On that basis, the Court held that "there is no question of inappropriate delegation of legislative power involved here."  *Id.*  Because the Executive possesses inherent authority over

25-14065                    LAGOA, J., Dissenting                    41

exclusion of aliens, "Congress may in broad terms authorize the executive to exercise the power[.]" *Id.* at 543.

The sovereign power to remove aliens rests on identical foundations. "The power to exclude aliens, and the power to expel them, rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but parts of one and the same power." *Fong Yue Ting*, 149 U.S. at 713. That power, Justice Gray explained, is "vested in the political *departments* of the government." *Id.* (emphasis added); *see also Sessions v. Dimaya*, 584 U.S. 148, 217–18 (2018) (Thomas, J., dissenting) (collecting "founding-era evidence that 'the executive Power,' Art. II, § 1, includes the power to deport aliens"); *Dep't of State v. Muñoz*, 602 U.S. 899, 912 (2024) (explaining that characterizing alien admission as "of favor and not of right" and noting that, "[c]onsistent with this view, the 1798 Act Concerning Aliens gave the President complete discretion to remove" aliens he judged dangerous) (internal quotation marks omitted). And, critical here, "[d]etention is necessarily a part of this deportation procedure. Otherwise aliens arrested for deportation would have opportunities to hurt the United States during the pendency of deportation proceedings." *Carlson v. Landon*, 342 U.S. 524, 538 (1952).

In *Jean v. Nelson*, this Court, sitting en banc, synthesized *Knauff*, *Fong Yue Ting*, and their predecessors and stated the principle directly: "[t]he political branches of the federal government therefore possess *concurrent authority* over immigration matters."

*Jean*, 727 F.2d at 965 (citing *Fong Yue Ting*, 149 U.S. at 713 and *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892)) (emphasis added).  We observed that courts have understood this concurrent authority as "a justification for permitting Congress to make remarkably broad delegations of its authority in the immigration field."  *Id.*  As a result, "the separation-of-powers doctrine places few restrictions" in this domain.  *Id.* at 966; *see also Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting) ("[N]o separation-of-powers problem may arise if the discretion is to be exercised over matters already within the scope of executive power.") (internal quotation marks omitted).

  *Knauff* did not merely recognize overlapping authority in the abstract.  It announced a principle that is the direct inverse of the major questions doctrine's central demand.  The doctrine demands that agencies point to "clear congressional authorization" before exercising powers of vast significance.  *West Virginia*, 597 U.S. at 723.  *Knauff* holds the opposite.  "It is not necessary," the Court explained, "that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program."  338 U.S. at 543 (quoting *Lichter v. United States*, 334 U.S. 742, 785 (1948)); *see also Fiallo v. Bell*, 430 U.S. 787, 799 (1977) ("[I]t is not the judicial role in cases of

25-14065                    Lagoa, J., Dissenting                    43

this sort to probe and test the justifications for the legislative decision."). These propositions cannot coexist.[13]

More recently, the Court has continued to recognize removal authority in *both* political branches. In *Arizona v. United States*, the Court held that removal decisions "touch on foreign relations and must be made with one voice," because "[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." 567 U.S. 387, 397, 409 (2012); *see also Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 348 (2005) (declining to infer restrictions on executive removal authority "not clearly set [] forth" by Congress, as doing so "would run counter to our customary policy of deference to the President in matters of foreign affairs").

---

[13] Nor does it matter that § 1225(b)(2)(A) names "the examining immigration officer" rather than the President. As Justice Kavanaugh has explained, statutory assignments to executive officers "are not analytically distinct" from assignments to the President because the President "controls, supervises, and directs those executive officers and agencies." *Consumers' Rsch.*, 606 U.S. at 699 n.1 (Kavanaugh, J., concurring) (citing *Myers v. United States*, 272 U.S. 52, 163–64 (1926)). They are "*de facto* delegations to the President." *Id.* And the Attorney General, through whom immigration officers act, "acts in his presumptively Art. II capacity when he administers the Immigration and Nationality Act." *INS v. Chadha*, 462 U.S. 919, 953 n.16 (1983); *see also* 8 U.S.C. § 1101(a)(18) (defining an "immigration officer" as "any employee or class of employees of the Service or of the United States designated by the Attorney General").

44                     LAGOA, J., Dissenting                    25-14065

In *Biden v. Texas*, the Court applied that principle to the very statutory scheme before us.  597 U.S. 785 (2022) (interpreting 8 U.S.C. § 1225(b)(2)(C)).  As the Court observed, "Article II of the Constitution authorizes the Executive to 'engag[e] in direct diplomacy with foreign heads of state and their ministers,' and that "the Court has taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy.'"  *Id.* at 805–06 (quoting *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015), and *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115–16 (2013)).  "That is no less true," the Court continued, "in the context of immigration law, where '[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy.'"  *Id.* at 806 (quoting *Arizona*, 567 U.S. at 397).

The *Learning Resources* plurality opinion applied the major questions doctrine with full force because it concluded that the President claimed a power the Constitution vests in "Congress alone."  146 S. Ct. at 642.  The sovereign power to expel aliens is different.  As Justice Robert Jackson observed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the *political branches* of government as to be largely immune from judicial inquiry or *interference*."  *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (Jackson, J.) (emphases added).  Here, Congress created a class. Congress mandated detention.  The Executive carries it out "not as

25-14065                 LAGOA, J., Dissenting                 45

the 'delegate' of Congress, but as the agent of the People." *Loving v. United States*, 517 U.S. 748, 777 (1996) (Scalia, J., concurring).

Whatever "overlapping authority" means in this context, Chief Justice Taft supplied the definition a century ago: "The sovereign power to expel aliens is political, and is vested in the political departments of the government. *Even if* the executive may not exercise it without congressional authority, Congress cannot exercise it effectively save through the executive." *Mahler v. Eby*, 264 U.S. 32, 40 (1924) (emphasis added).

When the majority subjects the government's reading of § 1225(b)(2)(A) to heightened skepticism, it does not vindicate the separation of powers. It inserts the judiciary into a domain entrusted to the political branches, precisely the interference that *Harisiades*, *Knauff*, *Mahler*, and a century of precedent counsel against.

## C.

The major questions doctrine does not apply here for the reasons given above. But even if it did, the statute satisfies it.

Several Justices have identified "telling clues" to assess whether a generally worded statute constitutes clear congressional authorization for a claimed power. *See West Virginia*, 597 U.S. at 746 (Gorsuch, J., concurring); *Learning Resources*, 146 S. Ct. at 707–09 (Kavanaugh, J., dissenting); *Nebraska*, 600 U.S. at 517–20 (Barrett, J., concurring). Though no majority opinion has adopted them as a formal test, and though they overlap at points, they provide a useful framework. I address each in turn.

*Old Statute, New Trick*.  The first inquiry concerns novelty. The question here is whether "an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy." *Util. Air*, 573 U.S. at 324 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).  Put differently, "an agency's attempt to deploy an old statute focused on one problem to solve a new and different problem may also be a warning sign[.]" *West Virginia*, 597 U.S. at 747 (Gorsuch, J., concurring).  That is unlikely here.  For the reasons given in Part I, the statutory text, context, and history make plain that Congress understood the effect of its revisions to § 1225(b)(2)(A), particularly in relation to its addition of § 1225(a)(1).  *See* 8 U.S.C. §§ 1225(a)(1), (3), (5), (b)(2)(C).

But if that were not enough, "[t]itles can be useful devices to resolve doubt about the meaning of a statute." *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring in the judgment) (internal quotation marks omitted).  Section 1225(b) is titled "Inspection of applicants for admission." Section 1225(b)(1) is titled "Inspection of *aliens arriving in the United States* and *certain other aliens* who have not been admitted or paroled."  (emphases added). Section 1225(b)(2) is titled "Inspection of other aliens."  Petitioner is not an arriving alien or otherwise captured by § 1225(b)(1).  He is, by process of elimination, one of the "other aliens" to whom § 1225(b)(2) applies.  Subsection (b)(2)(A) then narrows its reach to "the case of an alien who is an applicant for admission," with the

25-14065                    LAGOA, J., Dissenting                    47

result being mandatory detention.  Petitioner is an applicant for admission.  He falls within no enumerated exception.  *See* 8 U.S.C. § 1225(b)(2)(B).

In sum, section 1225(b)(2)(A) is a detention statute that, by its title and introductory text, applies to "applicants for admission" "other" than "aliens arriving in the United States and certain other aliens who have not been admitted or paroled."  The government interprets the statute to detain other applicants for admission not covered by § 1225(b)(1) or otherwise excepted under (b)(2)(B).  That is not an unheralded discovery.

Section 1182(d)(5)(A) further confirms there is nothing novel about the effect of § 1225(a)(1)'s deeming clause.  That provision authorizes the Attorney General to parole "any alien applying for admission."  8 U.S.C. § 1182(d)(5)(A).  An interior alien who entered without inspection qualifies as an alien "applying for admission" only by operation of § 1225(a)(1).  *See supra* Part I(A).  Whatever the scope of the parole authority under § 1182(d)(5)(A), both political branches have operated on the premise that the legal fiction created by the deeming provision applies to interior aliens for purposes of that provision.

Of course, IIRIRA is now three decades old.  But the relevant provisions, §§ 1225(a)(1) and (b)(2)(A), were enacted together and have operated in tandem since 1996.  This is not a case in which the government "attempt[s] to deploy an old statute focused on one problem to solve a *new and different problem*."  *West Virginia*, 597

48                    LAGOA, J., Dissenting                    25-14065

U.S. at 747 (Gorsuch, J., concurring) (emphasis added).  To say otherwise may be to identify a lack of enforcement; that objection is better addressed under the next inquiry.

*What Has the Agency Said.*  The second inquiry is institutional.  The focus is on "the agency's past interpretations of the relevant statute."  *West Virginia*, 597 U.S. at 747 (Gorsuch, J., concurring).  A "contemporaneous and long-held Executive Branch interpretation" is "entitled to some weight," *id.*; conversely, "the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred," *id.* at 725 (majority opinion) (internal quotation marks omitted).  The majority here observes that from 1997 to the present, every administration processed interior unlawfully present aliens under § 1226(a).  *See* Maj. Op. 51–53.  But the regulatory record is not the clean contrary-practice story the majority needs.

First, the 1997 interim rule implementing IIRIRA stated: "*Despite being applicants for admission*, aliens who are present without having been admitted or paroled … will be eligible for bond and bond redetermination."  Detention and Removal of Aliens, 62 Fed. Reg. 10312, 10323 (March 6, 1997) (codified at 8 C.F.R. pt. 1 et al.) (emphasis added).  The word "despite" is telling.  It concedes that aliens present without admission are, "applicants for admission," and frames bond eligibility not as a statutory entitlement, but as an accommodation notwithstanding what the statute would otherwise require.

25-14065                    LAGOA, J., Dissenting                    49

Second, the same 1997 rulemaking produced a regulation that affirmatively applies § 1225(b)(2)(A) to unadmitted aliens present in the interior.  Title 8 C.F.R. § 235.3(b)(1)(ii) provides:

> An alien *who was not inspected and admitted or paroled into the United States* but who establishes that he or she *has been continuously physically present in the United States* for the 2-year period immediately prior to the date of determination of inadmissibility *shall be detained in accordance with section 235(b)(2) of the Act* for a proceeding under section 240 of the Act.

8 C.F.R. § 235.3(b)(1)(ii) (emphases added).  This regulation is still in effect today.  It mandates detention under § 1225(b)(2)—not § 1226(a)—for aliens who were never inspected or admitted and who have been continuously present for two years.  These are interior aliens, not arriving aliens.  *See Buenrostro-Mendez,* 166 F.4th at 507.

Third, since 2012, the BIA understood that "many people who are not actually requesting permission to enter the United States in the ordinary sense are nevertheless deemed to be 'seeking admission' under the immigration laws."  *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 743 (BIA 2012).  The majority faults *Lemus-Losa* for "failing to give full effect to the phrase 'seeking admission' under the statute."  Maj. Op. 52–53 n.16.  That criticism misses the point.  *Lemus-Losa* demonstrates that the government's reading is not a recent invention.  The BIA recognized over a decade ago that the deeming provision carries through to "seeking admission."  *See also* 8 U.S.C. § 1182(d)(5)(A).  In any event, as discussed above, it is

the majority that reads "applicant for admission" out of § 1225(b)(2)(A), which is precisely what *Lemus-Losa* warned against. *See Buenrostro-Mendez*, 166 F.4th at 502.

Here, the agency acknowledged the authority in its own regulations but chose to process most interior aliens under § 1226. That choice is unsurprising. Section 1226 preserves executive discretion—the Attorney General "may" detain, "may" release on bond, "may" grant conditional parole. 8 U.S.C. § 1226(a). As the Court noted in *Jennings*, bond hearings for § 1226(a) detainees are provided by "[f]ederal regulations," not by the statute itself. 583 U.S. at 306. Section 1225(b)(2)(A), by contrast, "mandate[s] detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin." *Id.* at 302.

That the Executive long preferred flexibility over rigidity is not evidence that the mandatory authority was never conferred. *Cf. Cunha v. Freden*, 2026 WL 1146044, at *20 (2d Cir. Apr. 28, 2026) ("We recognize that agencies have strong incentives to maximize their own power and *discretion*.") (emphasis added). "Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise." *Fed. Trade Comm'n v. Bunte Bros.*, 312 U.S. 349, 352 (1941). The same must be true for a mandate.

*Whose Job Is It*. The third inquiry is functional. It asks whether the Executive's claimed action falls within "its congressionally assigned mission and expertise." *West Virginia*, 597 U.S. at 748 (Gorsuch, J., concurring). Here, we consider whether the Executive is regulating "outside its wheelhouse." *Nebraska*, 600 U.S.

25-14065                 LAGOA, J., Dissenting                 51

at 518 (Barrett, J., concurring).  If detaining aliens for removal pro-
ceedings is not in the immigration enforcement wheelhouse, noth-
ing is.

 *Where Congress Put It.*  The fourth inquiry is structural.  *See*
*West Virginia*, 597 U.S. at 730, 746–47 (Gorsuch, J., concurring)
(looking to "the legislative provisions on which the agency seeks to
rely with a view to their place in the overall statutory scheme")
(internal quotation marks omitted).  The concern is whether the
claimed authority rests on a central statutory provision or on
"oblique" and "cryptic" language, *see id.*, buried in a "previously
little-used backwater," *id.* at 730 (majority opinion).  Indeed, Con-
gress does not "hide elephants in mouseholes."  *Whitman v. Am.*
*Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

 Section 1225(b)(2)(A) is not a "paradigmatic 'elephant in a
mousehole.'"  *Contra* Maj. Op. 33.  It is, to borrow from Justice Ka-
vanaugh, "an elephant ([mandatory detention]) in a statutory ele-
phant hole."  *Learning Resources*, 146 S. Ct. at 711 (Kavanaugh, J.,
dissenting).  Justice Alito called § 1225(b)(2)(A)'s language "une-
quivocal."  *Biden v. Texas*, 597 U.S. at 824 (Alito, J., dissenting).  If
anything, the enumerated exceptions of § 1225(b)(2)(B) prove the
rule: "Detention for all others is mandatory."  *Id.* at 824 n.4; *see* 8
U.S.C. § 1225(b)(2)(B) (exempting an alien who is a "crewman," "to
whom paragraph (1) applies," or "stowaway" from section
1225(b)(2)(A)).

 The majority's characterization of § 1225(b)(2)(A) as "ancil-
lary" is difficult to square with the statute.  *See* Maj. Op. 36.  Unlike

section 111(d) of the Clean Air Act, for example, which had been described as an "obscure, never-used section of the law," *West Virginia*, 597 U.S. at 711, section 1225(b)(2)(A) is the INA's principal mandatory detention authority for applicants for admission. And the deeming provision on which it rests, § 1225(a)(1), is not buried in some "backwater." *See West Virginia*, 597 U.S. at 730. It is the opening line of § 1225.

More puzzling still is the majority's objection that the government's reading "transform[s] an ancillary catchall provision into the statute's chief detention mechanism." Maj. Op. 36. As in *Jennings*, the majority here acknowledges that § 1225(b)(2) is a "catchall." A catchall that catches all applicants for admission is not a transformation. It is a catchall.

The majority's objection is not that Congress hid the authority but that the authority granted is too large. *See* Maj. Op. 32–33, 50–51. Reading § 1225(b)(2)(A) to reach interior unadmitted aliens, the majority warns, echoed by Petitioner and *amici*, would "effect[] a mass detention campaign of every unadmitted alien present in the country." Maj. Op. 32. No one doubts the significance of the question presented. But the major questions doctrine asks for a "clear congressional authorization," *see West Virginia*, 597 U.S. at 723, not simply whether the consequences are vast.

Even on the majority's own reading, section 1225(b)(2)(A) mandates detention of every person who arrives at a port of entry without clear entitlement to admission, a population the government has "never had sufficient detention capacity" to hold. *See*

25-14065                    LAGOA, J., Dissenting                    53

*Biden v. Texas*, 597 U.S. at 792 (internal quotation marks omitted). Yet no one calls that an elephant in a mousehole.  The statute's reach has never been constrained by the size of the population it describes.  That is because the size of the affected population depends on the number of persons who decide to immigrate to the United States, a variable neither Congress nor the Executive directly controls.[14]

The separation of powers, after all, "does not prohibit any particular policy outcome."  *Gundy*, 588 U.S. at 172 (Gorsuch, J., dissenting).  It "is a procedural guarantee that requires Congress to assemble a social consensus before choosing our nation's course on policy questions."  *Id.*  Congress assembled that consensus when it enacted § 1225(b)(2)(A).

### III.    CONCLUSION

In reaching its conclusion, the majority rejects the text's ordinary meaning, reads past the deeming clause, refuses to apply this Court's en banc decision in *Villarreal*, and presents a reading that

---

[14] The size of the population Petitioner and *amici* invoke is itself partly a product of the Executive's prolonged failure to enforce the statute as written.  For nearly three decades, the government declined to apply § 1225(b)(2)(A) to interior aliens who entered without inspection.  The inevitable result was the accumulation of millions of unadmitted aliens in the interior.  Petitioner now points to those millions as evidence that Congress could not have intended the statute to reach them.  But the Executive's failure to enforce a statute cannot retroactively narrow its meaning.  If anything, the population's growth underscores the consequences of non-enforcement rather than the statute's intended scope.

54                    LAGOA, J., Dissenting                    25-14065

"taxes the credulity of the credulous." *Contra* Maj. Op. *33* (quoting *Maryland v. King,* 569 U.S. 435, 466 (2013) (Scalia, J., dissenting)).

Because I would reverse, I respectfully dissent.